**LOWE'S HOME CENTERS, INC. and Natasha Tanner, Appellants**

**v.**

**GSW MARKETING, INC. f/k/a Salesmakers, Inc. d/b/a CSA Services Southwest and Snow Mountain Construction, Inc., Appellees.**

**No. 14–07–00953–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

June 30, 2009.

Rehearing Overruled Sept. 10, 2009.

Robert McCabe, Danny M. Sheena, Jason P. Scofield, Houston, for appellants.

James A. Newsome, Jeffrey A. Fanaff, Houston, Spencer G. Markel, Bellaire, for appellees.

Panel consists of Justices YATES, GUZMAN, and SULLIVAN.

## OPINION

EVA M. GUZMAN, Justice.

In this negligent activity and premises liability case, Natasha Tanner asserts claims for the injuries she received when a tank fell from a toilet mounted on an elevated display in a home improvement store and struck her. She asserted claims against the company that built the display on which the toilet originally had been mounted, and the company that contracted to maintain the display from which the toilet actually fell. Because Tanner produced no evidence that either company had a duty to discover that the toilet itself was incorrectly assembled, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Appellant Natasha Tanner brought this action to recover for injuries she received in the course and scope of her employment by appellant Lowe's Home Centers, Inc. ("Lowe's") and for which she received workers' compensation benefits; Lowe's intervened to assert its subrogation rights. This suit arises from injuries Tanner sustained on April 12, 2003 when a toilet tank fell from an elevated display and struck her on the head. According to Tanner and Lowe's, the events leading to her injury began two years earlier. We discuss these events as described in the summary-judgment record and in accordance with the applicable standard of review, discussed *infra*.

## A. Snow Mountain and Southpro Displays

Lowe's agreed to sell and display toilets manufactured by American Standard, Inc. To that end, Lowe's hired appellee Snow Mountain Construction, Inc. ("Snow Mountain") to construct a display for its new Pasadena store during the period of time from April 5, 2001 to May 18, 2001. Snow Mountain did not design the display or supply materials for its construction, but instead received the materials from the display manufacturer and installed it in accordance with a "planogram" supplied by Lowe's. While Snow Mountain performed carpentry work, other vendors assembled the toilets.

Because the planogram called for the toilets to be attached to an angled, elevated display, the entity responsible for assembling the toilet was required to attach the lid to the tank with silicone. The unidentified vendor then placed the assembled toilets in front of the display until Snow Mountain employees installed them. Although not required to do so, Snow Mountain's owner Stanley Barker instructed his workers to move or push the tank to check that toilet bowl moved with it. Snow Mountain was not asked to check the nuts and bolts installed by the vendor who assembled the toilets, and Barker did not ask his employees to do so; they simply checked to see if each toilet moved as a single unit before attempting to lift and mount it to the display. After the toilets were installed, Snow Mountain's involvement ended.

American Standard also hired contractors to maintain its displays, and the contractor could subcontract the work to another independent contractor. In July 2002, Covington Sales & Services, Inc. d/b/a Service Express a/k/a Southpro Sales, Inc. ("Southpro") was responsible for maintaining the toilet display in the

Pasadena Lowe's store. Southpro directed an independent contractor, David Freeman d/b/a Freeman Sets & Service, to remove the toilets from the Snow Mountain display and reset them on a display built by Freeman or Southpro (the "Southpro Display").

## B. Maintenance of the Southpro Display

In a separate arrangement, American Standard also verbally agreed to employ CSA Services, Inc. ("CSA") to "assist [American Standard] with maintenance of displays and setting displays in stores...." CSA hired another company, Salesmakers, Inc. ("Salesmakers"), n/k/a GSW Marketing, Inc., to perform the actual work.

CSA provided training and instruction to Salesmakers on how displays were to be maintained. When servicing the displays, Salesmakers' employees answered a set of questions on a "call sheet" that, according to CSA, "would lead our guys through, as well as a Lowe's store, to make sure that the stores were set properly, set to CSA, Lowe's and the manufacturer's standards, and to document that, when we walked out of the store, that everything was in saleable and in good working order." A Lowe's employee was also asked to review the call sheet, verify that the display maintenance work was done, and sign the sheet.

On March 21st, 2003, a Salesmakers employee visited the Pasadena store and completed a call sheet, which was signed by Lowe's employee Natasha Tanner. On April 12, 2003, the tank of one of the displayed toilets separated from the bowl and fell from the elevated display, striking Tanner. It appeared from subsequent investigation that the toilet was incorrectly assembled at the time of the accident. If the toilet had been assembled in accordance with the manufacturer's instruc-tions, then a bolt would have been inserted inside the toilet tank, passing through a rubber washer before it emerged from the bottom of the tank. The bolt would have continued through a pre-drilled hole in the top of the toilet bowl and exited from the underside of the bowl, where it would have been secured by a metal washer and a nut. It instead appeared that the metal washer was not used, and the rubber washer was used in its place between the underside of the toilet bowl and the nut. According to Tanner and Lowe's, the tank fell when its weight pulled the rubber washer and nut through the pre-drilled hole in the toilet bowl, allowing the tank and the bowl to separate.

## C. The Lawsuit

Tanner collected workers' compensation from Lowe's and sued American Standard, Snow Mountain, Southpro, Freeman, CSA, and Salesmakers; Lowe's intervened to assert its subrogation claim. All of the defendants moved for summary judgment. As relevant to this appeal, Salesmakers moved for traditional summary judgment on Tanner's claims of negligent activity and premises liability on the ground that it had no duty to inspect the connection between the toilet tank and the toilet bowl, which remained affixed to the display. Salesmakers also moved for no-evidence summary judgment. With regard to the premises-liability claim, Salesmakers argued there was no evidence that (1) it was the possessor of the premises, (2) a condition on the premises posed an unreasonable risk of harm, (3) Salesmakers knew or reasonably should have known of the danger, (4) it breached its duty of ordinary care by both failing to adequately warn of the condition and failing to make the condition reasonably safe, and (5) Salesmakers' breach proximately caused Tanner's damages. As to Tanner's negligence

claim, Salesmakers asserted there was no evidence that (1) it owed Tanner a legal duty, (2) it breached the duty, (3) the breach proximately caused Tanner's injury, and (5) Tanner suffered damages.

Snow Mountain moved for no-evidence summary judgment, arguing there was no evidence (1) that it had a duty to inspect and maintain the display, (2) that it breached a duty to properly mount the toilet or construct the display, and (3) of causation.

The trial court denied the traditional and no-evidence summary-judgment motions filed by Southpro, CSA, and Freeman and granted summary judgment to American Standard, Snow Mountain, and Salesmakers. Lowe's and Tanner then non-suited their claims against CSA and Southpro with prejudice, settled with Freeman, and now appeal the judgment in favor of Snow Mountain and Salesmakers.[1] Due to the identity of their interests, we refer to both appellants collectively as "Tanner" except where the context otherwise requires.

## II. ISSUES PRESENTED

In two issues, Tanner contends that the trial court erred in granting summary judgment in favor of Snow Mountain and Salesmakers.

## III. STANDARD OF REVIEW

We review summary judgments de novo, *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005), and where the trial court grants the judgment without specifying the grounds, we affirm the summary judgment if any of the grounds presented are meritorious. *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872–73 (Tex.2000). We consider all grounds the appellant preserves for review

that are necessary for final disposition of the appeal. *Cincinnati Life Ins. Co. v. Cates*, 927 S.W.2d 623, 626 (Tex.1996).

In a traditional motion for summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). To be entitled to traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex.1997). Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex. 2005). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex.1979).

In a no-evidence summary judgment, the movant represents that there is no evidence of one or more essential elements of the claims for which the non-movant bears the burden of proof at trial. TEX.R. CIV. P. 166a(i); *Green v. Lowe's Home Ctrs., Inc.*, 199 S.W.3d 514, 518 (Tex.App.-Houston [1st Dist.] 2006, pet. denied). We sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital

---

1. They have not appealed the judgment in    favor of American Standard.

fact. *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997). "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003) (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex.1983)).

## IV. ANALYSIS

■ Tanner sued both Snow Mountain and Salesmakers on the same two theories of liability: negligent activity and premises liability, also known as premises defect. *See Clayton W. Williams, Jr., Inc. v. Olivo*, 952 S.W.2d 523, 527 (Tex.1997). To recover on a negligent-activity theory, Tanner was required to prove that she was injured by or as a contemporaneous result of the defendant's activity rather than by a condition created by the activity. *Keetch v. Kroger Co.*, 845 S.W.2d 262, 264 (Tex. 1992). In response to the appellees' respective motions for no-evidence summary judgment, Tanner produced no evidence that Snow Mountain or Salesmakers was engaged in ongoing activities on the premises at the time she was injured. Thus, the trial court properly granted summary judgment in favor of both appellees on Tanner's negligent-activity claim. *See id.* (holding that the trial court properly refused to submit a negligent-activity instruction to the jury in the absence of evidence that the defendant was engaged in an ongoing activity at the time of injury). We therefore overrule both of Tanner's issues regarding this cause of action, and affirm summary judgment in favor of Snow Mountain and Salesmakers as to the negligent-activity claim.

■ Tanner's remaining claims of premises liability required proof, with regard to each defendant, of the following elements: (1) actual or constructive knowledge of some condition on the premises by the owner/operator, (2) the condition posed an unreasonable risk of harm, (3) the owner/operator did not exercise reasonable care to reduce or eliminate the risk, and (4) the owner/operator's failure to use such care proximately caused her injuries. *See id.* (citing *Corbin v. Safeway Stores, Inc.*, 648 S.W.2d 292, 296 (Tex.1983)).

## A. Snow Mountain

### 1. Contractual Duties

■ Tanner first contends that the trial court erred in granting Snow Mountain's motion for no-evidence summary judgment regarding her premises-defect claims. In support of this position, she analogizes Snow Mountain to a general contractor, and citing *Redinger v. Living, Inc.*[2] and *Clayton W. Williams, Jr., Inc. v. Olivo*,[3] argues that "[i]f a contractor retains 'some' right of control over the activity creating the premises defect, it will owe a duty to warn others of the defect." She further points out that "[i]t is typically the general contractor's right of control over the injury-causing activity or condition that gives rise to a duty to ensure that the independent contractor performs its work safely." *See Clayton W. Williams, Jr.*, 952 S.W.2d at 528. Here, the injury-causing condition was the incorrectly-attached tank of the toilet; as Tanner's expert attested, "the American Standard tank fell on Natasha Tanner because there was no metal washer between the nut and bowl in the tank/bowl connection." Thus, Tanner was required to prove that Snow Mountain retained the right to control the work of the unidentified person or vendor in assembling the toilet or otherwise adding or

---

**2.** 689 S.W.2d 415, 417–18 (Tex.1985).

**3.** 952 S.W.2d at 528.

removing connections between the toilet tank and bowl.

■■■■ A plaintiff can prove the right to control by evidence of a contractual agreement that explicitly assigns the possessor that right. *Coastal Marine Serv. of Tex., Inc. v. Lawrence,* 988 S.W.2d 223, 226 (Tex.1999).[4] Determining whether a contract provides a right of control is a question of law. *See Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 783 (Tex.2001). The control "must relate to the *manner* in which the work is performed rather than the quality of the result." *Welch v. McDougal,* 876 S.W.2d 218, 223 (Tex.App.-Amarillo 1994, writ denied). Based on the italicized portions of the following provisions found in the "General Conditions" section of Snow Mountain's contract with Lowe's, Tanner contends she produced more than a scintilla of evidence that Snow Mountain had the requisite contractual right of control:

3. **Working Conditions.** The Contractor [i.e., Snow Mountain] hereby warrants and represents that he has *inspected* the job site and is *familiar with all working conditions* which exists [sic] there, including subsurface conditions, and that he has made due allowance for such conditions in his price calculation and estimate of time for completion, to include overtime and/or night work.

4. **Conduct of the Work.** Contractor will diligently prosecute the Work, providing sufficient manpower and tools at all times to assure completion of the Work in an orderly fashion by the completion date. All materials, prefabrication and supplies shall be provided by Owner [i.e., Lowe's]. If additional supplies are needed, Con-

tractor shall notify Owner, in writing, and materials will be sourced as soon as possible. Contractor shall at all times keep the job site reasonably neat and clean and upon completion shall remove and dispose of all rubbish, trash and refuse from the Work site and leave the job site broom clean daily. If Work site is not cleaned or remains in poor condition after Work is complete, Contractor may be debited charges for cleaning or repairing Work site.

The Parties agree that the Contractor's relationship with the Owner is that of an independent contractor.... The Parties further agree that the Owner is interested only in the results obtained by the Contractor under this Agreement and that the *Contractor has sole control over the manner and means by which it performs such obligations under this Agreement;* provided, however, that nothing within this Paragraph shall supersede the Owner's guarantee and inspection rights as set forth below. The *Owner will not have control over, and will not be responsible for, safety precautions and programs* in connection with the Work, *since these are solely the Contractor's responsibility* as provided above.

5. **Guaranty and Inspection.** Contractor guarantees that all *labor provided* for the Work shall be of *first quality,* in full compliance with the requirements of the Contract Documents and free from defect for a period of one year from the completion of the Work....

6. **Safety.** The Contractor shall conduct the work in a *safe and prudent*

---

4. Tanner does not contend that Snow Mountain actually exercised control. *Cf. id.* (explaining that a party can prove the existence of a right of control by evidence of explicit assignment of the right or evidence that a control actually was exercised).

*manner* in compliance with all applicable safety laws, rules and regulations. The Contractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with the performance of the Work.

Relying on these provisions, Tanner argues that Snow Mountain owed a duty to her because it was in control of the premises and in charge of safety.

But the language on which she relies does not support this position. The agreement does not give Snow Mountain possession or control over the premises, and it does not grant Snow Mountain the right to control the manner in which any other contractor performs its work. To the contrary, it addresses only Snow Mountain's performance of its own work, defined as follows:

> The Contractor shall provide all labor and tools necessary to complete all work *as per plans and specifications.* Such performance shall be in accordance with the Contract Documents and shall be referred to as the "Work[ ]."

(emphasis added). The Contract Documents consist of (a) the Construction Agreement, (b) the General Conditions, (c) "Special Conditions and Carpentry List printed in the Lowe's Contractor Bid for Carpentry Work in New/Relo Store Setups," and (d) Lowe's Plans and Specifications as submitted prior to each project startup. The summary-judgment record contains only the first two documents, neither of which contains a requirement that Snow Mountain supervise or inspect the work of other contractors.

As Stan Barker, Snow Mountain's president testified, the company was hired "to do all the carpentry work in the store." The store identified in the contract is the Lowe's location in Pasadena. Thus, the Pasadena store is the "job site." It does not follow from Snow Mountain's inspection of the store and its familiarity with working conditions there that Snow Mountain also inspected and was familiar with the quality of the connections between each display toilet's individual components; moreover, there is no evidence that the toilet at issue was even assembled at that time,[5] and thus, no evidence that a dangerous condition was then in existence.

■ There also is no evidence that Snow Mountain had or exercised control over the person or entity responsible for assembling the toilets. Snow Mountain agreed to inspect the job site, not the assembly of individual products, and agreed to conduct its own work safely, not to ensure that other contractors did so as well. *See Clayton W. Williams, Jr.,* 952 S.W.2d at 527–28 ("[A] general contractor normally has no duty to ensure that an independent contractor performs its work in a safe manner.") (citing *Exxon Corp. v. Quinn,* 726 S.W.2d 17, 19–20 (Tex.1987) and *Abalos v. Oil Dev. Co. of Tex.,* 544 S.W.2d 627, 631–32 (Tex.1976)); *Abalos,* 544 S.W.2d at 631 ("[W]here the activity is conducted by, and is under the control of, an independent contractor, and where the danger arises out of [their] activity . . ., the responsibility or duty is that of the independent contractor, and not that of the owner of the premises."). Snow Mountain was hired to perform carpentry work, not plumbing work; it was required to build and install a display and mount the assembled toilets onto it, but it did not assemble the toilets.

---

5. The effective date of the contract was March 16, 2001. It was executed by Snow Mountain's principal on March 31, 2001, and it called for Snow Mountain to perform its work from April 5, 2001 through May 18, 2001.

Tanner also argues that Snow Mountain owed a duty to Tanner because it was in charge of safety. We disagree. Snow Mountain's safety obligations did not extend beyond its own work, and it was responsible only for building a wooden display, installing the display in the bay, and attaching the pre-assembled toilets to it. The toilets were moved to a different display nine months before Tanner's accident, and there is no evidence that Snow Mountain exercised any control over the second display at any time.

### 2. Creation of a Dangerous Condition

■ Tanner also argues that in mounting the display at an angle, Snow Mountain created a dangerous condition by increasing the stress on the weak tank/bowl connection. Here, appellants argue that by doing precisely the job Snow Mountain was hired to do—i.e., mounting the toilets at an angle as required by Lowe's—it created a dangerous condition. Even assuming that Snow Mountain created a dangerous condition by building the display and attaching the toilets to it as instructed, this was not the "dangerous condition" that injured Tanner; to the contrary, it is undisputed that the tank fell because a metal washer was missing from the outside of the tank after the toilet was moved to a different display, and in the washer's absence, the bolt simply pulled the nut through the bolt-hole. Tanner cites no evidence to indicate that the washer was omitted from the initial assembly rather than being removed during the reset or at any other time, and there is no evidence that Snow Mountain had or exercised control over the unknown assembler. *See IHS Cedars Treatment Ctr. of DeSoto, Tex., Inc. v. Mason,* 143 S.W.3d 794, 799 (Tex.2004) ("[C]ause in fact is not established where the defendant's negligence does no more than furnish a condition which makes the injuries possible."). We therefore overrule the remainder of Tanner's first issue.

## B. Salesmakers

Tanner next argues that the trial court erred in granting Salesmakers's motion for no-evidence summary judgment on her claims of negligence and premises liability. This theory of liability is based on the Restatement (Second) of Torts, section 324A(b):

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if . . .
>
> . . .
>
> (b) he has undertaken to perform a duty owed by the other to the third person. . . .

Tanner argues that Salesmakers "specifically undertook a duty owed by American Standard, the owner of the toilets, to *regularly* inspect the toilets for safety. It was the job of [Salesmakers] to inspect the toilets on a *monthly basis* and confirm that they were 'safe and secure.'"

■ But section 324A imposes a duty to perform without negligence only the task that the actor has undertaken to accomplish. Although this rule expands the class of persons to whom the duty of care is owed, it does not expand the scope of the undertaking. The Texas Supreme Court explained the source and nature of such a duty in *Fox v. Dallas Hotel Co.,* 111 Tex. 461, 473, 240 S.W. 517, 520–21 (1922), *overruled on other grounds, Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981). There, a company agreed with a building

tenant to maintain the elevators serving the tenant's store, but due to the company's negligence, store employee Alexander Fox was killed. *Id.* As the court explained:

> Upon defendant in error taking over the control and repair of the elevators, to promote its own interests, it became charged with the duty, declared in the instructions of the trial court, to exercise ordinary care to maintain the elevators in a condition of reasonable safety for use. This duty to one using the elevators depended in no wise on any contractual obligation in favor of the user from defendant in error. The duty is grounded on the obligation to exercise ordinary care in an undertaking which cannot otherwise be carried on without endangering the lives and limbs of others. An elevator such as that in which Fox was injured is a structure designed and maintained for use by human beings. Death or bodily harm to a fellow being is the natural consequence of failure to keep the elevator in repair. Having brought under its control a mechanical appliance, which was, or should have been, known to be attended by grave risks, defendant in error was under the specific, legal duty to exercise ordinary care to protect those for whose use the appliance was provided against the risks it foresaw or should have foreseen.

*Id.* Here, however, there is no evidence that Salesmakers undertook to render services to CSA that Salesmakers should have recognized as necessary for the protection of third persons. This is most easily demonstrated by examining the chain of delegated responsibilities from American Standard to Salesmakers.

Tanner relied in part on the deposition testimony of Christopher Brett Warren, American Standard's former regional manager. Warren testified that American Standard sold the toilets to Lowe's, and Lowe's then generated a "planogram" showing where each toilet was to be displayed. American Standard then used independent service providers such as CSA to maintain the displays, but the service provider's function was to ensure that merchandise was displayed in accordance with the planogram:

> Q: How would [you] know if—how do you know if something is incorrect?
>
> A: Looking at the pictures.
>
> Q: By looking at the pictures, you can tell whether or not a certain toilet is located in the right location; is that correct?
>
> A: Correct.
>
> Q: And if you find that a toilet is incorrectly placed, you inform CSA Services, and they, in turn, go and fix it; right?
>
> A: Correct.
>
> Q: That's the extent of your review; is that correct?
>
> A: Yes.

Although CSA was expected to display the assembled toilets in a safe manner, American Standard did not delegate to CSA any duty to inspect the toilets for correct assembly because American Standard believed that the toilets were correctly assembled at the outset:

> A: We expect that they, the service reps, display the products in a safe manner and, when the job is complete, that those products are safely installed.
>
> . . .
>
> Q: And you want to make sure that each component of the toilets, the safety hazards that we talked about, are also safe and secure; right?
>
> A: We expect that that's completed.
>
> Q: But you don't give any instructions to any of your service vendors as to

how they are to make sure that the toilets themselves are secure and safe; is that correct?

A: Correct.[6]

. . .

Q: Based upon this call sheet, is it the responsibility of CSA Services to check the safety and security of American Standard displays each time they inspect an American Standard display?

A: Yes.

. . .

Q: And you expected for them to spot anything obviously wrong, but you did not expect for them to go back and make sure that the tank was originally assembled correctly?

A: Correct.

According to Warren, American Standard's management trained service providers to understand the uses of its products, but did not provide any training regarding safety. In particular, Warren testified that American Standard had never requested its service providers to verify that the actual washers are present in the connection between the tank and the bowl, and it provided no assembly instructions to inform its providers of how a toilet should be correctly assembled.

William Walter McConnell, III of CSA similarly testified that Lowe's provided the planogram but did not provide instructions for assembling the toilets. Like Warren at American Standard, McConnell testified that CSA's own employees were not required to inspect the toilets to determine if the tank/bowl connection was secured by a metal washer. He explained that the connection would not be examined unless the tank moved when a CSA employee touched the toilet while dusting it or while placing

or removing "stickers" of price or product information. According to McConnell, CSA employees were asked to determine only if the "total display" was safe and secure, and not to independently assess whether the toilets themselves were correctly assembled. Finally, but significantly, McConnell testified regarding CSA's expectations of its own employees; Salesmakers, however, is an independent contractor.

In support of her contention that Salesmakers owed her a duty, Tanner cites *City of Denton v. Page* for the proposition that one who agrees to make safe a known, dangerous condition of real property may be liable for the failure to remedy the condition. *See* 701 S.W.2d 831, 835 (Tex. 1986) (citing *Gundolf v. Massman–Johnson*, 473 S.W.2d 70 (Tex.Civ.App.-Beaumont 1971), *writ ref'd n.r.e.*, 484 S.W.2d 555 (Tex.1972) (per curiam)). In *Page*, however, the court emphasized that this general rule applies if (a) the dangerous condition is known,(b) the actor assumes control over the premises, or (c) the actor assumes a duty to discover any dangerous condition existing on the premises. *Id.* at 834. There is no evidence that a dangerous condition was known or that Salesmakers assumed control of the premises, but Tanner infers that Salesmakers assumed a duty to discover any dangerous condition.

The strongest evidence that arguably would support such an inference is the fourth page of the call sheet, which contains the following parenthetical and question: "(It is imperative all displays are safe and secure!) Are all of the American Standard displays secured properly?" The term, "displays," however, is not ambiguous; it refers to the structure on which the toilets are mounted. Moreover, the parts of the toilets that had been attached to the display remained affixed to it, and the

6. Objections omitted.

display itself remained secured to the bay. There is no evidence that the display itself—i.e., the structure built to display the toilets—was not secure, or that the base of the toilet was not firmly affixed; rather, the toilet itself came apart. This question will not bear the strained interpretation that it actually inquires into whether one part of the toilet is connected to another part of the toilet in accordance with the assembly instructions.[7] We therefore overrule the remainder of Tanner's second issue.

## V. CONCLUSION

Having overruled each of the appellants' issues, we affirm the judgment of the trial court.

---

7. We also note that Tanner failed to argue causation, and it is not presumed. *See John R. Francis Bldg. Co. v. Bob Meador Co.*, 517 S.W.2d 693, 695 (Tex.Civ.App.-Houston [14th Dist.] 1974, no writ). She included the affidavit of Beryl Gamse in her summary-judgment evidence, and Gamse opines that Salesmakers was "negligent in not detecting the improper connection at their first inspection after the toilets were initially installed and/or after the reset." Nevertheless, Tanner presented no evidence that the washer was missing as of the date of Salesmakers's "first inspection after the toilets were initially installed and/or after the reset."