**M7 CAPITAL LLC, Appellant,**

v.

**Theodore B. MILLER, Jr. a/k/a Ted B. Miller, Jr., Appellee**

No. 14-08-00951-CV.

Court of Appeals of Texas, Houston (14th Dist.).

April 29, 2010.

---

Louis Jerome Stanley, Baton Rouge, LA, for appellant.

Robert H. Singleton, Jr., Randall L. Brim, Houston, for appellee.

Panel consists of Justices ANDERSON, BOYCE, and CHRISTOPHER.*

## SUBSTITUTE OPINION

TRACY CHRISTOPHER, Justice (Assigned).

We overrule appellee's motion for rehearing, withdraw our opinion of March 25, 2010, and substitute this opinion in its place.

This is an appeal of a summary judgment granted in the defendant's favor on the claimed breach of an option contract. On appeal, the plaintiff argues that (a) the absence of a signed writing setting forth the agreement's terms does not bar enforcement of an option contract to purchase an interest in a limited partnership, and (b) there is evidence raising a genuine issue of material fact on each of the challenged elements of plaintiff's claim. Because we agree with both points, we reverse the judgment and remand the case to the trial court.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

In November 2002, John P. Miller ("John") and Ted Miller ("Ted") began to discuss forming a limited partnership to purchase the assets of Fairchild Aircraft out of bankruptcy. Ted bid on some assets from a San Antonio bankruptcy in December and on some assets from a Virginia bankruptcy in February 2003. Closing on both purchases was set for April 1, 2003. John and Ted agreed that an entity controlled by Ted would own at least a 51%-interest in the limited partnership they planned to form (the "Partnership").

John or an entity he controlled would have an option to purchase up to 49% of the Partnership by paying (a) an amount equal to 49% of the equity Ted invested, and (b) 20% compound interest on the amount Ted invested, with such interest accruing only until John's company bought a share in the Partnership. As consideration for the option contract, John agreed to give Ted 3% of Lifebridge, an entity controlled by John's family. Ted and John orally agreed that John's company would have to purchase its interest in the Partnership within ninety days after Ted's company closed on the assets.

In March 2003, Ted formed the Limited Partnership (M7 Holdings, LP), invested $3.4 million in it, and obtained financing for the remaining $10 million required to purchase the assets. Ted sent John the Limited Partnership Agreement for M7 Holdings, LP at that time. John formed appellant M7 Capital LLC ("M7") to purchase an interest in the Partnership, and he and Ted agreed that the percentage that M7 would be permitted to purchase in the Partnership would decrease over time. On March 26, 2003, John sent an email to Ted summarizing their agreement as follows:

[M7] has an option to make the investment of 49% of the equity required at closing. If not, the option to buy equity reduces to 44% for the first 30 days following closing, then 39% for the second 30 days following closing, then 34% for the next 30 days, at which time [M7] will have no option to buy stock....

The Partnership closed on the assets of the bankrupt companies on April 1, 2003. Thus, M7 could have purchased 49% on

---

* J. Tracy Christopher, sitting by assignment before her appointment to this court.

1. In accordance with the standard of review, we describe the summary judgment evidence in the light most favorable to the nonmovant.

April 1, 44% on May 1, 39% on May 31, and 34% on June 30, 2003.

On June 4, 2003, John, acting as CEO and Managing Principal for M7, sent Ted an email entitled "Decision concerning [partnership] purchase," in which John stated as follows:

> [M7] will move forward with its purchase of 34% of [the partnership]. . . . I will yield to your decision as to when Taylor [Cooksey, Ted's attorney] should become involved. I have attached the ownership structure if you wish to provide this to Taylor, which includes the purchase price plus accrual of bridge loan fees to you until closing. . . . I will continue to follow your lead as to my role in the building of the company.

Attached to the email is a document entitled "Purchase Price and Fees Until Closing," in which John lists the "Purchase Price for 34% ownership" of the Partnership as $1,184,582 and states that bridge loan fees until June 1, 2003 are $39,486, with an additional fee of $649 per diem until closing.

On June 27, 2003, Taylor Cooksey sent a memorandum (the "Memorandum") to Ted and two nonparties regarding M7's proposed acquisition of an interest in the Partnership. In the Memorandum, a copy of which was sent to M7, Cooksey wrote as follows:

> We may anticipate that the referenced investment, pursuant to which [M7] may acquire ***up to***[2] a thirty-four percent (34%) interest in [the Partnership], will require modification of the existing [partnership agreement] as generally outlined below. . . . Please note that the following is intended only for the convenience of the parties and is not intended to be a definitive term sheet.

1. Our office must receive written confirmation of the escrow deposit of [M7]'s funds by no later than 5:00 p.m. (CST) on Monday, June 30, 2003. Time is of the essence and failure to meet this deadline will terminate any further discussions. The amount of deposit should be $1,255,000 ($1,245,000 for the 34% interest, plus $10,000 toward Ted Miller's attorneys['] fees.) . . . .

. . .

3. The Agreement will be modified to include Buy/Sell provisions triggered upon various events including . . . cessation of employment by John Miller. . . . Any purchase price arising under the Buy/Sell provisions will be fair market value established via one or more independent appraisers.

M7 did not deposit $1,255,000 into escrow by 5:00 p.m. on June 30, 2003. Instead, John H. Bryan III, an investor in M7, transferred $750,000 to the escrow account on that date. M7 argues that this sum represents the purchase price for a 20.48% interest in the partnership. There is no evidence in the record explaining how M7 computed that percentage.

Nine days later, on July 9, 2003, Ted emailed John an amended Limited Partnership Agreement for M7 Holdings LP, with a signature line for M7 as a Class B limited partner and with a provision for transfer of "a ___ percent (___%) Class B Limited Partnership interest to M7." Under this agreement, if John ceased to be both (a) a direct or indirect owner of M7 and (b) an employee or consultant of the Partnership, then the Partnership or its remaining partners had the right to purchase all or part of M7's interest in the Partnership for the lesser of the dollar value reflected in M7's capital account or half of its fair market value.

---

2. Emphasis added.

Ted filled in the evidentiary gaps in his reply brief to his motion for summary judgment. John wired $10,000 to Ted on July 2, 2003 for the attorney fees. John emailed Ted on July 11, 2003 cancelling the transaction. John stated in the email that M7 would not proceed with the purchase of the ownership interest from Ted and requested return of the escrow money. However, Ted did not request or receive permission to supplement the summary judgment record; therefore this evidence cannot be considered by this court on appeal. *See* TEX.R. CIV. P. 166a(d) (a summary judgment movant relying on previously unfiled discovery products must file the material or a notice specifically referring to such material twenty-one days before the summary judgment hearing). Because there is no basis in the record from which to conclude that the trial court granted leave for the late filing, we presume the trial court did not consider this evidence. *Envtl. Procedures, Inc. v. Guidry,* 282 S.W.3d 602, 620 (Tex.App.-Houston [14th Dist.] 2009, pet. denied).

On July 5, 2007, M7 sued Ted Miller for over $13 million, alleging that Ted "made it impossible for [M7] to perform on the agreement by purposefully including provisions in the Amended Partnership Agreement that would allow [Ted] to purchase [M7's] interest in [the Partnership]" at half of fair market value if John Miller—who had no employment contract with the Partnership—ceased to be employed by it. Ted filed a motion for traditional and no-evidence summary judgment which the trial court granted, and this appeal ensued.

## II. ISSUES PRESENTED

In three issues to be addressed in this appeal, M7 challenges the trial court's grant of summary judgment in Ted's favor.[3] In its first issue, M7 contends the trial court erred in granting Ted's no-evidence summary judgment motion because M7 produced summary judgment evidence that raised a genuine issue of material fact on each of the challenged breach of contract elements. In its second issue, M7 argues that the trial court erred in granting no-evidence summary judgment based on Ted's erroneous assertion that an option contract is unenforceable unless it is in writing, signed by the offeror, recites the consideration for the option, and proposes an exchange within a reasonable time. M7 argues in its third issue that the trial court erred in granting the traditional summary judgment because the absence of a signed option contract does not conclusively negate the existence of an enforceable contract.

## III. STANDARD OF REVIEW

We review summary judgments de novo. *Ferguson v. Bldg. Materials Corp. of Am.,* 295 S.W.3d 642, 644 (Tex.2009) (per curiam). When the trial court grants the judgment without specifying the grounds, we affirm the judgment if any of the grounds presented are meritorious. *See W. Invs., Inc. v. Urena,* 162 S.W.3d 547, 550 (Tex.2005). We consider all grounds the appellant preserves for review that are necessary for final disposition of the appeal. *See Diversicare Gen. Partner, Inc. v. Rubio,* 185 S.W.3d 842, 846 (Tex.2005). Here, Ted moved for summary judgment on both traditional and no-evidence

**3.** M7 originally presented five issues on appeal, but Ted Miller concedes that the arguments M7 presents regarding two of those issues are correct. Specifically, Ted's summary judgment motion was based in part on M7's deemed admissions, but after the motion was filed, M7 was permitted to withdraw them. M7 argues—and Ted agrees—that summary judgment cannot be affirmed on the basis of the withdrawn admissions. We therefore sustain M7's fourth and fifth issues without further discussion.

grounds; thus, we apply the standard of review appropriate for each type of summary judgment, taking as true all evidence favorable to the nonmovant and indulging every reasonable inference and resolving any doubts in the nonmovant's favor. *See Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 157 (Tex.2004).

■■ In a traditional motion for summary judgment, the movant has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX.R. CIV. P. 166a(c); *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 425 (Tex.1997). To be entitled to traditional summary judgment, a defendant must conclusively negate at least one essential element of each of the plaintiff's causes of action or conclusively establish each element of an affirmative defense. *Id.* Evidence is conclusive only if reasonable people could not differ in their conclusions. *City of Keller v. Wilson*, 168 S.W.3d 802, 816 (Tex.2005). Once the defendant establishes its right to summary judgment as a matter of law, the burden shifts to the plaintiff to present evidence raising a genuine issue of material fact. *Westland Oil Dev. Corp. v. Gulf Oil Corp.*, 637 S.W.2d 903, 907 (Tex.1982).

■■ In a no-evidence summary judgment, the movant represents that there is no evidence of one or more essential elements of the claims for which the nonmovant bears the burden of proof at trial. TEX.R. CIV. P. 166a(i); *Lowe's Home Ctrs., Inc. v. GSW Mktg., Inc.*, 293 S.W.3d 283, 287 (Tex.App.-Houston [14th Dist.] 2009, pet. denied). We sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d)

the evidence conclusively establishes the opposite of the vital fact. *Lowe's*, 293 S.W.3d at 287–88 (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion'" that the challenged fact exists. *Akin, Gump, Strauss, Hauer & Feld, L.L.P. v. Nat'l Dev. & Research Corp.*, 299 S.W.3d 106, 115 (Tex.2009) (quoting *Kroger Tex. L.P. v. Suberu*, 216 S.W.3d 788, 793 (Tex.2006)).

## IV. ANALYSIS

■ A successful breach of contract claim requires proof of the following: (a) a valid contract, (b) performance or tendered performance by the plaintiff, (c) breach of the contract by the defendant, and (d) damages sustained by the plaintiff as a result of that breach. *Grynberg v. Grey Wolf Drilling Co., L.P.*, 296 S.W.3d 132, 136 (Tex.App.-Houston [14th Dist.] 2009, no pet.). In his traditional motion for summary judgment, Ted contends that he conclusively proved that the contract was not valid because an option contract cannot be oral. In his no-evidence motion for summary judgment, Ted contends there is no evidence of any of these four elements. The arguments and evidence concerning each ground for summary judgment are discussed below.

### A. Existence of a Valid and Enforceable Contract

■ According to Ted, the Texas Supreme Court adopted section 87 of the Restatement (Second) of Contracts in *1464–Eight, Ltd. v. Joppich*, 154 S.W.3d 101 (Tex.2004). To be enforceable pursuant to section 87(1)(a), an option contract must (1) be in writing, (2) be signed by the offeror, (3) recite the consideration for the offer, and (4) propose an exchange on fair

terms within a reasonable time. *See* RE-STATEMENT (SECOND) OF CONTRACTS § 87(1)(a) (1981). Ted argues that because there is no evidence that an option contract satisfying these four "Restatement elements" existed, there is no evidence of a valid, enforceable option contract. Relying on John's testimony that no writings signed by Ted Miller set forth the terms of the option contract, Ted moved for traditional summary judgment on the same grounds.

Both arguments rest on a misinterpretation of *Joppich* and a successor decision by this court. In *Joppich*, the petitioners argued that "the respondent's offer to sell real property should be binding as an option contract because the offer was in writing and signed by the respondent, acknowledged the receipt of a nominal consideration of ten dollars, and proposed an exchange on fair terms within a reasonable time." *Joppich*, 154 S.W.3d at 102. These arguments were directed to the requirements listed in section 87(1)(a) of the Restatement (Second) of Contracts. Joppich responded that the option contract was unenforceable because the petitioners never paid the nominal consideration recited. The Texas Supreme Court followed section 87(1)(a) of the Restatement (Second) of Contracts only in agreeing that when an option contract contains a recital that some nominal sum constitutes consideration for the option, the contract is enforceable despite the failure to pay the sum recited. *Id.* at 108–110.

Ted further argues that, according to this court, the Texas Supreme Court adopted the elements of section 87 of the Restatement as mandatory requirements for creating an enforceable option contract. *See Sandel v. ATP Oil & Gas Corp.*, 243 S.W.3d 749, 752 (Tex.App.-Houston [14th Dist.] 2007, no pet.). In *Sandel* we stated that "the Texas Supreme Court adopted

section 87 of the Restatement (Second) of Contracts regarding option contracts" in *Joppich. Id.* at 752. But that statement must be read in context. The Texas Supreme Court merely "incorporated" the language from section 87(1)(a) that describes the recital of consideration, rather than the payment of consideration, as an element in an enforceable option contract. *See Joppich*, 154 S.W.3d at 102, 108–10. And in *Sandel*, we did not read *Joppich* to stand for the proposition that an option contract is unenforceable if it does not comply with the Restatement elements. This is readily seen by comparing the two cases. In *Joppich*, it was undisputed that the nominal consideration recited—as stated in section 87 of the Restatement—was not paid; in *Sandel*, the parties disputed whether consideration was recited *or paid*—a factor not mentioned in the Restatement. Thus, after determining that the purported option contract did not recite consideration, we addressed the question of whether consideration had been paid. *Sandel*, 243 S.W.3d at 752 (evaluating appellant's claim that his continued employment was consideration for an option). This step would have been unnecessary if, as Ted contends, an option contract is enforceable only if the contract complies with the elements listed in the Restatement.

Ted has made no other argument, either at trial or on appeal, in support of his position that an oral option contract is unenforceable, and we have found no case in which an option contract that was not subject to the statute of frauds was held unenforceable simply because it was not in writing. *Cf. Miga v. Jensen*, 96 S.W.3d 207, 209, 213 (Tex.2002) (addressing the correct measure of damages for breach of an oral option contract for the purchase of stock). Because M7 offered more than a scintilla of evidence that a valid and enforceable contract existed, and no applica-

ble precedent supports Ted's argument that an oral option contract necessarily is unenforceable as a matter of law, summary judgment cannot be affirmed on this basis.

■ Ted also argues in his reply brief that no consideration actually was paid for the option. But the oral agreement included the promise to pay the 3% interest in Lifebridge, which would happen at closing. The contract was allegedly breached before the final closing took place. In addition, the lack of payment of the consideration merely meant that Ted could revoke the option. *Culbertson v. Brodsky*, 788 S.W.2d 156, 157 (Tex.App.-Fort Worth 1990, writ denied). Ted does not argue that he revoked the option before acceptance. Absent such a contention, a promise to pay consideration is all that is necessary for a valid option. *See Joppich*, 154 S.W.3d at 105.

## B. Evidence that M7 Performed or Tendered Performance

■ Ted also moved for summary judgment on the grounds that there is no evidence that M7 performed or tendered performance. To prove that it performed or tendered performance of its own contractual obligations, a plaintiff must demonstrate that it complied with the contract's provisions. *Preston State Bank v. Jordan*, 692 S.W.2d 740, 744 (Tex.App.-Fort Worth 1985, no writ). In the absence of equitable considerations not presented here, an option contract may be exercised only in strict compliance with the contract's terms. *Zeidman v. Davis*, 161 Tex. 496, 499, 342 S.W.2d 555, 558 (1961); *Jones v. Gibbs*, 133 Tex. 627, 639, 130 S.W.2d 265, 271 (1939). "Acceptance of an option must be unqualified, unambiguous, and strictly in accordance with the terms of the agreement." *Comeaux v. Suder-*

*man*, 93 S.W.3d 215, 220 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (citing *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 558 (Tex.App.-San Antonio 1997, no pet.)). A failure to exercise an option according to its terms, including a defective performance, legally amounts to a rejection. *Id.*

■ But not all option contracts contain detailed specifications as to how the option must be exercised. "Unless the option contains provisions to the contrary, all that is required of the optionee is that he notify the optionor, prior to the expiration of the option, of his decision to exercise the option." *W. Fed. Sav. & Loan Ass'n v. Atkinson Fin. Corp.*, 747 S.W.2d 456, 461 (Tex.App.-Fort Worth 1988, no writ). The " '[o]ptionee thereafter has a reasonable time within which to complete the deal.' " *Luccia v. Ross*, 274 S.W.3d 140, 148 (Tex.App.-Houston [1st Dist.] 2008, pet. denied) (quoting *W. Fed. Sav. & Loan Ass'n*, 747 S.W.2d at 461).

It is not clear whether M7 argued that it exercised its option by performance or by notification of its acceptance of the option. Because the evidence raises a fact issue under either approach, we conclude that summary judgment was not warranted.

### 1. Exercise by Performance

Ted argues that the option could be exercised only by strict compliance with the terms in the Memorandum. On appeal, M7 argues that the Memorandum contained terms to which it did not agree. Ted argues that M7's position is inconsistent because M7 alleged in its pleadings and in its summary judgment response that the Memorandum "evidenced" the parties' agreement. A memorandum from Ted's agent to M7 containing instructions for exercising the option is evidence that an option agreement existed.[4] This does

---

4. In light of such a closing memorandum it is      hard to understand how Ted could argue that

not foreclose M7's arguments about performance.

In any event, M7 produced more than a scintilla of evidence that it acted in accordance with the "closing instructions" in the Memorandum, which allowed it to purchase "up to" a 34%-interest in the Partnership. M7 contends that its deposit of $750,000 by the deadline in the Memorandum was for a purchase of 20.48% interest in the Partnership. The Memorandum, by its terms, allowed for a purchase of less than 34% when it used the words "up to" a 34% interest. The money could have included a deposit for the attorney fees as well. This is more than a scintilla of evidence of strict compliance with the terms of the Memorandum. This evidence raises a fact issue as to whether M7 strictly complied with the terms of the Memorandum (if a jury agrees that the Memorandum was the exclusive way for M7 to perform).

### 2. Exercise by Notification and Performance in a Reasonable Time

According to M7, the parties' oral agreement did not specify how M7 was to exercise the option. M7 notified Ted on June 4, 2003 that it was purchasing a 34%-interest in the Partnership for $1,184,582, plus loan fees in the amount of $39,486, together with additional fees of $649 per day from June 1, 2003 until closing. M7 then performed by depositing $750,000 by the June 30 deadline, with closing to follow. M7 did not explain why it did not place a deposit for the entire amount or whether it planned to do so by closing, but M7 nonetheless produced more than a scintilla of evidence that it notified Ted of its intent to exercise the option and produced more than a scintilla of evidence of actual performance by depositing money in the escrow account. The parties anticipated a formal closing to follow, and the law allows an optionee a reasonable time to complete the deal. *See Luccia*, 274 S.W.3d at 148. Thus, a fact issue exists as to whether M7 exercised the option and performed in a reasonable time.

In its appellate brief, M7 contends for the first time that there are questions of fact as to whether Ted waived any deficiencies in M7's acceptance of the option offer or whether the time for M7 to perform its obligations under the option contract was extended. Because these arguments were not presented to the trial court, we do not consider them on appeal. *See* TEX.R.APP. P. 33.1(a); TEX.R. CIV. P. 166a(c); *City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678 (Tex. 1979).

### C. Evidence of Breach and Damages

M7 contends that Ted breached the contract by presenting M7 with partnership documents with material changes. M7 presented evidence showing the changes in the partnership documents and an affidavit explaining why those terms were unacceptable. M7 also supplied an affidavit supporting its damages.

### V. CONCLUSION

We reject Ted's argument that there cannot be an oral option contract. M7 presented more than a scintilla of evidence of the existence of a valid and enforceable contract, performance, breach, and damages; in so doing, M7 raised fact issues that foreclose summary judgment. Accordingly, we reverse the judgment and remand the case to the trial court.

there was "no evidence" of an agreement. It is understandable that Ted would argue that

there was no evidence of a written, signed option agreement.