Jose Hermilo **REQUENA** and Mary Sue Requena, Appellants,

v.

**OTIS ELEVATOR COMPANY,** Appellee.

No. 01–08–00378–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 15, 2009.

Langdon M. Smith, Richard A. Stucky, Jim Adler & Associates, Houston, TX, for Appellant.

Bradley M. Bingham, Debra L. Bradberry, Samuel W. Veenstra, Bingham, Mann, House & Gibson, Houston, TX, for Appellee.

Panel consists of Justices KEYES, ALCALA, and HANKS.

## OPINION

EVELYN V. KEYES, Justice.

Appellant, Jose Hermilo Requena, sued Otis Elevator Company ("Otis") for negligence after he was hurt using an industrial freight elevator. The trial court granted Otis's motion for judgment notwithstanding the verdict after the jury returned a verdict in favor of Requena. Requena argues in his sole issue that the trial court erred in granting Otis's motion for judgment notwithstanding the verdict.[1]

We affirm.

### Background

Requena was an employee of Linbeck Construction Company, a contractor on the premises of St. Luke's Episcopal Hospital in Houston, Texas. On October 26, 2004, Requena's supervisor asked him and two co-workers to move some building materials using the hospital's service elevator. The service elevator had both a bi-parting door that opened and closed horizontally and a bi-parting safety gate that opened and closed vertically. Both the door and the gate closed when the elevator car moved. The elevator was designed to stay at a floor when the doors were left open, but a person on another floor could call the elevator and cause the door and gate to close and the elevator to start moving. The call button was designed to sound a buzzer to alert passengers on other floors that the elevator door and gate were about to close. When the button was depressed for a certain length of time, the buzzer would sound and the elevator door and gate would close.

While Requena and his co-workers were loading the materials into the service elevator, an employee from another contractor, Fisk Electric Company ("Fisk"), pressed the elevator button to call the elevator to the basement. Requena was standing on the threshold of the elevator attempting to maneuver the building materials into the elevator at a 45–degree angle when he and his co-workers heard the buzzer sound numerous times. Requena and his co-workers yelled to the Fisk employee that they were using the elevator, but the Fisk employee pushed the call button in the basement, causing the buzzer to sound continuously for one to two minutes. The elevator gate then closed and the upper part of the gate struck Requena and injured his neck and back. Requena sued Otis, alleging that it was negligent in maintaining the elevator.[2] Requena's wife, Mary Sue Requena, also sought to recover damages against Otis based on loss of household services and loss of consortium.

Trial began on February 27, 2008. At trial, Requena testified that he heard the buzzer, and, when asked whether he had ample time to get out of the way after hearing the buzzer, he responded, "The bell is designed to let you know that somebody is calling for [the elevator]. That's

---

1. Mary Sue Requena, wife of appellant Jose Requena, is also named as an appellant; however, Requena stated in his brief that he was not appealing the trial court's judgment notwithstanding the verdict as it related to Mary Sue.

2. Requena also sued Fisk, alleging it was negligent because the Fisk employee pressed the button calling the elevator to the basement, which caused the elevator gate to close and strike Requena. The trial court subsequently granted Requena's motion to dismiss Fisk from the suit with prejudice.

what the bell is designed. So, what we did, we hurried it up so we could move and get out of the way and move on down to wherever it was going." Requena testified that neither of his co-workers had time to warn him that the doors were closing and that the doors closed too fast for him to move out of the way. On cross-examination, Requena testified that it was standard practice at the time of the accident for someone wishing to call the elevator to press the buzzer three times as a warning and then to hold the button down to actually call the elevator. He testified that, prior to the door's closing on his neck, he had heard the buzzer sound at least three times. He also testified that the buzzer sounded for one to two minutes prior to the gate's descent. He knew that when the buzzer sounded the elevator doors would soon close, and he testified that it was "standard practice" for all the workers to step out of the threshold of the elevator door when the buzzer sounded. He also testified that there was enough room for him to move into the elevator. He further testified that if he had followed standard practice at the time of the accident he would not have been struck by the elevator gate.

Requena testified that he sought medical care immediately after the accident and was initially diagnosed with a strain. He was prescribed pain medicine and anti-inflammatory drugs, and he returned to work two days later. At a doctor's visit sixteen days after he was struck by the elevator, Requena reported to his physician that his neck felt "a whole lot better." Approximately four days after he reported that his neck was getting better, Requena reinjured himself while cutting countertop materials with a band saw. His physician treated him with more pain medication and injections in his neck and back, and he underwent an MRI and various x-rays. He was eventually diagnosed with two herniated disks in his neck and underwent surgery to correct the herniated disks. Requena testified that he has suffered constant pain in his neck since the accident with the elevator doors.

Requena also testified that he had seen the elevator doors strike other people in the past, and that he had "brought it up" with "the maintenance guy that was housed there at St. Luke's." [3] Requena did not testify regarding his specific conversations with this mechanic because the trial court sustained Otis's hearsay objection to them.

Requena also presented testimony from Vincent Garza, an Otis mechanic assigned to work on the elevator system at St. Luke's Hospital. Garza testified that he performed maintenance on the service elevator on a "callback" basis. Garza testified that he would "visit the elevator upon a request for a call and try to troubleshoot and pinpoint deficiencies or[,] if it wasn't running, get it running." He testified that a pressure gauge could be used to adjust an elevator door or gate, but he did not carry a stop watch or pressure gauge in his tool box. He also testified that a "gate closing too fast" would be a hazard to elevator users, and he discussed his general procedure for addressing complaints that an elevator's doors were closing too quickly. However, Garza did not testify

---

**3.** The record does not clearly identify the person to whom Requena made these comments—whether it was Vincent Garza, someone else from Otis, or someone who worked permanently for St. Luke's. Later, Requena's counsel asked, "[D]id you ever speak to an Otis guy prior to the accident?" However, the trial court sustained Otis's objection and that question was never answered. There is no other evidence regarding any complaints made about the elevators in general or about the particular elevator that struck Requena.

about the condition of the particular elevator doors that struck Requena.

Requena also presented testimony from Brian Hebert, Vincent Garza's supervisor at Otis. Hebert testified that Garza has been employed by Otis for 25 years and that he had been Garza's supervisor for three years. He testified that all Otis employees must read specifications on Otis equipment to maintain the equipment properly. However, the service elevator was not an Otis elevator, and Otis had no maintenance plan for the elevator. He testified that St. Luke's Hospital had the responsibility to maintain the safety of the elevator operating system and that Otis had the responsibility "[t]o perform maintenance and repairs on that elevator, to perform annual inspections on the elevator, with the inspecting authority." He also testified that St. Luke's made its own decisions regarding the scheduling of routine maintenance and it did not use the "Otis Maintenance Management System" to schedule maintenance. Instead, St. Luke's used internal scheduling processes based on the amount of "usage of the elevator" to manage the elevator's maintenance. Regarding routine maintenance, Hebert agreed that Otis's maintenance records showed that routine maintenance had been completed on November 18, 2003, January 8, 2004, April 8, 2004, July 30, 2004, and December 14, 2004. He further agreed that it "appear[ed] that bi-monthly-scheduled procedures were not documented . . . because St. Luke's Hospital had [its] own documentation. So if there was a service [call] while you were there and you did preventative maintenance, you would document it on their paperwork rather than Otis'." He then testified, "These are not our elevators. These elevators belong to St. Luke's Hospital. We only maintain the elevators, we don't own them. These elevators were operating as designed and installed according to the City of Houston inspector."

Hebert testified that a reasonable pressure reading for a closing elevator door is "less than 30 pounds" and that he was unsure if Garza inspected the door weight or closing speed. He testified that the American National Standards Institute, the City of Houston, and the State of Texas "all said that inspecting the speed of the [elevator] doors a minimum of once a year is a good requirement." He testified that an Otis mechanic who notices an unsafe condition is supposed to notify his supervisor, and the following exchange occurred.

Q. [W]ouldn't it be the responsibility of Otis who's maintaining the elevator to make sure that it's working properly?

A. If we saw the problem or if the problem were brought to our attention by the owner of the elevator, it would be our responsibility to correct it.

Hebert further testified that the speed of the elevator door and gate was checked annually by a City of Houston inspector. However, Hebert did not testify about any specific complaints or service calls regarding the elevator that struck Requena.

Finally, Requena presented expert testimony from Richard Baxter, an elevator consultant and qualified elevator inspector who had previously worked for Otis. Baxter testified that the American National Standards Institute A17.1 safety code for elevators contains the industry standard for door forces, including door speeds, and that the City of Houston inspects elevators based on this standard and others. He testified that Otis had a duty to warn St. Luke's of any hazards involving the elevator door or gate. He further testified that "Otis knew that they were having problems with the elevator, that the elevator

had been reported. Vince Garza reported it to his supervisor, Brian Hebert, that the elevator was hitting people; and they took the position in their depositions that it was only a nuisance that the elevator doors— the elevator gate was striking people." Baxter opined that "if you strike somebody enough, at some point in time you're going to injure somebody; and that's exactly what took place." He also opined that Hebert and Garza were negligent for not having warned St. Luke's of the fact that the doors or the gates were striking passengers.[4]

Baxter testified that he had never done an inspection of the elevator, but that he did review maintenance records. He also testified that there was no indication that any inspecting authority had found any violations regarding the elevator's operation, that on the day of Requena's incident there was nothing wrong with the elevator, and that "the elevator probably behaved the way it was designed." He further testified that the elevator was "code-compliant and safe" in the manner in which the warning system and door-closing mechanism operated.

On cross-examination, Baxter testified that the service elevator "was not only safe but it was compliant with [the safety] code" under which the elevator was installed. He also testified that he had "no idea" about the rate of the door speed or the measure of other door forces at the time of the incident.

At the end of Baxter's testimony, Requena rested his case. Otis moved for directed verdict on the liability issues, arguing that

the evidence is quite clear there was no evidence that the elevator was danger-

ous, no evidence that it deviated—that Otis' maintenance of the elevator or the elevator itself deviated from the standard of care in the industry, or that Otis, more importantly and fundamentally, failed to do that which a reasonably prudent elevator company would not have done under the same or similar circumstances.

Otis also argued that there was "no evidence of causation." Requena responded,

[There is a fact issue that should go to the jury that there was complaints. There is evidence that people were being hit by the elevator.... Otis had a duty to warn the premises owner of these accidents and to make sure that they modified and made it safer.... Additionally, they failed to test the equipment. They failed to inspect it regularly.... And I believe that there is a negligent act on the part of Otis as well as that there is a fact issue that the jury must decide whether, in fact, Mr. Requena did not have an opportunity to move out of the way.]

The trial court stated that Otis was entitled to a directed verdict because Requena had not "made your case." However, the trial court stated that it was sending the case to the jury because if the trial court granted the motion for directed verdict Requena "would likely have no choice but to cause your client to defend an appeal. Whereas if the jury returns a defense verdict, what is there to appeal?" The trial court denied Otis's motion and, after Otis rested without presenting any witnesses, charged the jury.

In question number one, the jury was asked, "Did the negligence, if any, of those

4. The record does not contain any evidence regarding Otis's knowledge of previous instances of people being struck by the elevator doors or of any reports made to Otis. The portions of Hebert's and Garza's depositions discussed by Baxter were not admitted into evidence during trial or presented to the jury except through Baxter's testimony.

named below proximately cause the occurrence in question?" The jury answered "yes" as to Requena, Fisk, and Otis. In question number two, the jury was asked, "What percentage of the negligence that caused the injury do you find to be attributable to each of those found by you, in your answer to Question No. 1, to have been negligent?" The jury found Requena's negligence to be 35% responsible, Fisk's negligence to be 15% responsible, and Otis's negligence to be 50% responsible. In response to question number three, the jury found that Requena was entitled to $50,000 in damages for past damages and $150,000 for damages that "in reasonable probability will be sustained in the future." In response to question number four, the jury found that Requena's wife was not entitled to any damages for loss of household services or loss of consortium.

Otis filed a motion for a judgment notwithstanding the verdict. The trial court granted the motion, and, on April 8, 2008, the trial court signed its judgment granting Otis's motion for judgment notwithstanding the verdict and motion to disregard the jury's answers finding Otis's negligence 50% responsible for Requena's injuries and awarding Requena damages. Requena appealed the trial court's grant of judgment notwithstanding the verdict.

**Judgment Notwithstanding the Verdict**

Requena argues in his sole issue that the trial court erred in granting Otis's motion for judgment notwithstanding the verdict.

**A. Standard of Review**

We review a judgment notwithstanding the verdict under a legal-sufficiency standard, viewing the evidence and inferences in the light most favorable to the jury's finding. *City of Keller v. Wil-*

son, 168 S.W.3d 802, 823 (Tex.2005). We sustain the granting of a judgment notwithstanding the verdict based on "no evidence" when the record shows: (1) a complete lack of evidence of a vital fact; (2) the trial court is barred by the rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is not more than a scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Id.* at 810; *see also Tiller v. McLure,* 121 S.W.3d 709, 713 (Tex.2003) (holding trial court may grant judgment notwithstanding verdict if there is no evidence to support jury's finding on issue necessary to liability).

If more than a scintilla of evidence supports the jury's finding, "the jury's verdict, and not the trial court's judgment must be upheld." *Wal–Mart Stores, Inc. v. Miller,* 102 S.W.3d 706, 709 (Tex.2003). More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway,* 135 S.W.3d 598, 601 (Tex.2004) (quoting *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997)). Evidence that is "so weak as to do no more than create a mere surmise," however, is no more than a scintilla and, thus, no evidence. *Id.* (quoting *Kindred v. Con/Chem, Inc.,* 650 S.W.2d 61, 63 (Tex.1983)).

If the trial court does not state its grounds for granting a motion for judgment notwithstanding the verdict, as is the case here, the ruling will be upheld if any of the stated grounds in the motion will uphold the judgment. *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991). It is the appellant's burden to discredit each ground in the appellee's motion. *Kenneco Energy, Inc. v. Johnson & Higgins of Texas, Inc.,* 921

S.W.2d 254, 259 (Tex.App.-Hous. [1st Dist.] 1995); *Friedman v. Houston Sports Ass'n,* 731 S.W.2d 572, 573 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.).

## B. Negligence

To establish negligence, a party must establish a duty, a breach of that duty, and damages proximately caused by the breach. *Kroger Co. v. Elwood,* 197 S.W.3d 793, 794 (Tex.2006); *see also Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990).

### 1. Duty

 Whether a duty exists is a threshold inquiry and a question of law; liability cannot be imposed if no duty exists. *Kroger,* 197 S.W.3d at 794; *Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex.1998). "In determining whether the defendant was under a duty, the court will consider several interrelated factors, including the risk, foreseeability, and likelihood of injury weighed against the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Greater Houston Transp. Co.,* 801 S.W.2d at 525.

 Otis argued that it did not owe Requena a duty "of the scope urged by Requena." Requena argues that Otis owed him a duty to perform particular acts of regular maintenance, such as completing a bi-monthly inspection and conducting frequent testing of the elevator's doors closing speed and pressure. "[A]n elevator owner owes a duty of ordinary care to protect invitees from an unreasonable risk of harm because of the elevator." *Dallas Mkt. Ctr. Dev. Co. v. Liedeker,* 958 S.W.2d 382, 384 (Tex.1997) ("In other words, an elevator owner's liability is for a defect in the premises that presents an unreasonable risk of harm, and his duty is to use ordinary care to prevent such harm."),

*overruled on other grounds, Torrington Co. v. Stutzman,* 46 S.W.3d 829 (Tex.2000); *see also Lowe's Home Centers, Inc. v. GSW Mktg., Inc.,* 293 S.W.3d 283 (Tex. App.-Houston [14th Dist.] 2009, no pet.) ("[S]ection 324A [of the Restatement (Second) of Torts] imposes a duty to perform without negligence only the task that the actor has undertaken to accomplish.") (quoting *Fox v. Dallas Hotel Co.,* 111 Tex. 461, 240 S.W. 517, 520–21 (1922) ("Upon defendant . . . taking over the control and repair of the elevators . . . it became charged with the duty . . . to exercise ordinary care to maintain the elevators in a condition of reasonable safety for use."), *overruled on other grounds, Burk Royalty Co. v. Walls,* 616 S.W.2d 911 (Tex.1981)). We conclude that Otis, to the extent that it acted as the agent of the elevator's owner in charge of maintenance and repairs, owed Requena only a duty to exercise ordinary care to maintain the elevator in a condition of reasonable safety for use.

### 2. Breach

 Otis argues that Requena failed to establish that it breached any duty of care that it owed to Requena because there was no evidence that the elevator malfunctioned or that it was unreasonably dangerous. *See Elwood,* 197 S.W.3d at 794 (holding that breach of duty must be established to recover for negligence).

Here, Requena provided no more than a scintilla of evidence to prove that the elevator malfunctioned. He provided no evidence as to the reasonable speed of a closing elevator door or gate. He provided no evidence as to the actual speed of the closing elevator door and gate that struck him. Hebert testified that the speed of the elevator door and gate was checked annually by a City of Houston inspector. Requena did not provide any testimony from other users that the speed of the closing door or gate was unreasonable or unsafe. Requena's expert, Baxter,

testified that there was no indication that any inspecting authority had found any violations regarding the elevator's operation. Although Requena argues that people were struck by the elevator and that complaints had been made about the elevator, he fails to point to any record references of specific incidents.

All of the evidence establishes that the elevator functioned properly. Requena heard the buzzer sound for one to two minutes prior to the closing of the gate, but remained standing in the threshold of the elevator door despite his knowledge that the buzzer signaled that the door and gate would soon close. Requena's own expert, Baxter, testified that the elevator was both code-compliant and safe. He also testified that on the day of Requena's incident, "the elevator probably behaved the way it was designed."

Requena failed to prove that Otis breached its duty to maintain the elevator in a condition of reasonable safety for use.

### 3. *Causation*

Otis also argues that Requena failed to show that failure to properly maintain the elevator caused Requena's injury. Because we have already determined that Otis did not breach its duty to maintain the elevator in a condition of reasonable safety for use and that Requena presented no evidence that the elevator actually malfunctioned, we determine that Requena also failed to establish that Otis's maintenance, or, as Requena argues, its lack of maintenance, caused Requena's injury.

We overrule Requena's sole issue.

### Conclusion

We affirm the judgment of the trial court.