**Opinion issued March 13, 2014**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-12-00862-CV**

———————————

**KNIFE RIVER CORPORATION-SOUTH, Appellant**

**V.**

**ESMERALDA HINOJOSA, INDIVIDUALLY AND AS REPRESENTATIVE OF THE ESTATE OF ANDRES HINOJOSA, DECEASED, AND AS NEXT FRIEND ON BEHALF OF MELISSA HINOJOSA, VANESSA HINOJOSA, ANDREA HINOJOSA, AND ANDRES HINOJOSA, JR, Appellee**

---

**On Appeal from the 335th District Court**
**Washington County, Texas**
**Trial Court Case No. 34659**

---

# O P I N I O N

In this wrongful death and survivor suit, Knife River Corporation-South appeals a judgment rendered against it in favor of Esmeralda Hinojosa,

Individually and as Representative of the Estate Of Andres Hinojosa, Deceased, and as Next Friend on Behalf of Melissa Hinojosa, Vanessa Hinojosa, Andrea Hinojosa, and Andres Hinojosa, Jr. Knife River raises three issues on appeal, which include its assertion that the trial court erred by denying its directed verdict on the plaintiff's negligent-undertaking claim.

We reverse and render.

## Background Summary

On August 30, 2010, Andres Hinojosa was driving his tractor-trailer, loaded with gravel, on Highway 105 in Washington County, when his vehicle overturned. Hinojosa told emergency personnel at the scene that the accident was precipitated by his driving onto the paved shoulder of the road to avoid a head on collision with a vehicle that had crossed over into his lane. Hinojosa was taken to the hospital, where he died from his injuries.

A reconstruction of the accident showed that Hinojosa had been in control of his vehicle until he had reached a location in the highway where there is a concrete box culvert running under the road. At that location, the improved shoulder of the road narrows from 10 feet to 6.3 feet. On the roadway above the culvert, where the pavement of the shoulder ends, the ground sloped dramatically at a 45 degree angle, creating a drop off. The drop off was 1.8 feet to the left of, and 1.7 feet

2

above, the culvert headwall. Tall vegetation grew along the shoulder's edge, camouflaging the precipitous slope.

Reconstruction of the accident also revealed that, as he drove along the paved shoulder, Hinojosa's right front tire had fallen into the drop off. This caused the rear of his vehicle to fall to the right and the front of the vehicle to turn to the left. When the tires regained the pavement, Hinojosa's vehicle was turning sharply to the left, resulting in a rollover of the tractor-trailer.

The Texas Department of Transportation ("TxDOT") had, at some point before the accident, placed an "object marker" on the side of the road to mark the headwall of the culvert. An object marker is a yellow and black striped sign intended to warn a motorist that there is a hazard to the right of the sign and to indicate to the motorist that he should drive to the left of the sign to avoid the hazard. The state trooper who investigated Hinojosa's accident would later testify that the drop off, into which Hinojosa's right front tire fell, was to the left of the object marker. Thus, a driver could stay to the left of the object marker and nonetheless drive off the drop off.

The section of Highway 105 where Hinojosa's accident occurred had last been repaved in 2005. In 2004, TxDOT had hired Knife River Corporation-South ("Knife River") to resurface a 4.5 mile section of Highway 105. The location on

3

Highway 105 where Hinojosa's accident would later occur was within this 4.5 mile section.

Knife River and TxDOT signed a contract regarding the resurfacing project. Incorporated into the contract were TxDOT's final project plans. The plans indicated that the project was "for the construction of asphalt concrete pavement overlay consisting of one course surface treatments and pavement markings [and] markers."

The plans also provided the following: "No edge drop offs exceeding 3:1 shall be left exposed to traffic. Backfilling these areas shall be considered incidental to the various forms of work." Backfilling referred to the part of the road construction project occurring after the new layer of asphalt had been laid, in which material—in this case recycled, ground asphalt—was placed along the newly paved edges of the road to create a gradual slope, or transition. The three-to-one ratio related to the slope of the road. For every three feet of horizontal distance, the drop in the slope of the road would be no more than one foot of vertical distance. This was to ensure a gentle slope from the traveled portion of the roadway to the unimproved portion of the shoulder.

On the front page of the project plans, three stand-alone phrases were listed in the center of the bottom of the page. These phrases were "No Exceptions," "No Railroads," and "No Equations."

The project plans also expressly incorporated specifications adopted by TxDOT. These specifications were contained in the publication "Standard Specifications for Construction and Maintenance of Highways, Streets and Bridges," published by TxDOT. Section 4.3 of the specifications indicated that a contractor, such as Knife River, should give written notice to the TxDOT engineer managing the project when the contractor encountered differing or latent conditions not addressed by the project plans. After receiving written notice, the TxDOT engineer would then investigate and determine whether cost adjustments should be made for the project.

Knife River began the resurfacing project on April 14, 2005. On May 3, 2005, Joe Sustaita, Knife River's asphalt plant manager, made a notation in the project's work diary. The notation read, in part: "There are some safety issues on the box culvert sections which really need to be fixed. The shoulder drops right off the edge along these box culverts. The [S]tate needs to get a change order to extend the boxes further or put up guard rail on these sections."

Raymond Vasquez, the Knife River employee in charge of the work site, made a notation in the work diary the following day, May 4, 2005. The notation pertains to the section of the highway where Hinojosa would have his accident five years later. Vasquez wrote, "We had to put [vertical panels] on the shoulder where it was deep and also where the shoulder is narrow and has a straight drop off and is

5

very dangerous[.]  I told the [TxDOT inspector] about getting a change order and fix the problem on the shoulder by extending [the] box culverts."  Vasquez would later testify that he had verbally informed the on-site TxDOT inspector about the drop off existing in the area of the culvert.  Vasquez also testified that he had not sent written notice to the TxDOT engineer regarding the drop off.

When Knife River finished the resurfacing project in August 2005, the drop off remained.  A TxDOT engineer inspected Knife River's work by driving the 4.5 mile stretch that had been resurfaced.  The engineer approved and accepted the work performed by Knife River.  Hinojosa's fatal accident occurred five years later.

Hinojosa's wife, Esmeralda, filed suit against Knife River, in her individual capacity, as representative of the Estate of Andres Hinojosa, and as next friend of the couple's four children.  Mrs. Hinojosa, hereinafter "Appellee," asserted survivor, wrongful death, and negligence claims.  Knife River timely designated TxDOT as a responsible third party pursuant to section 33.004 of the Civil Practice and Remedies Code.[1]

At the time of trial, Appellee's second amended petition was the live pleading.  In the petition, Appellee alleged, "On entering a contract which it should have recognized as necessary to the protection of the public, Knife River [] had a

---

[1]     *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.004 (Vernon Supp. 2013).

duty to exercise reasonable care in the performance of that contract." She claimed that Knife River's negligence included its failure to send written notice to TxDOT "clearly identifying the sheer edge drop off and conveying the degree of danger the defect presented. . . ." Appellee asserted that Knife River should have sent written notice "identifying the need to extend the shoulder over the culvert and eliminate the danger or need to place a guardrail at the area of the sheer drop off in order to isolate traffic from the danger." Appellee claimed that Knife River should have requested a "change order," that is, permission from TxDOT to change the scope of the work that had been agreed upon to address the danger presented by the drop off.

Appellee proceeded to trial before a jury, asserting a theory of negligent undertaking against Knife River based on section 324A of the Restatement (Second) of Torts. Appellee claimed that Knife River had undertaken certain duties in the construction contract for the benefit of a third person, Andres Hinojosa. Appellee claimed that, based on the construction contract, Knife River (1) had undertaken a duty not to leave a drop off with a greater than three-to-one ratio and (2) had undertaken a duty to send written notification to TxDOT regarding the drop off. Appellee asserted that Knife River had not used reasonable care in performing these undertaken duties.

Among Appellee's trial exhibits was the construction contract between TxDOT and Knife River. The contract indicated that Knife River had been retained to lay a new layer of asphalt over the existing pavement and then to backfill along the road edges to achieve a 3:1 gradient. There is no dispute that a 3:1 gradient could not have been achieved at the drop off merely by backfilling the road's edge. Rather, the evidence at trial showed that the drop off could only be eliminated, and a 3:1 gradient achieved, by extending the concrete box culvert and then backfilling over it. The work required to extend the culvert was not within the scope of the work defined in the contract. Knife River had not been hired to extend the box culvert and was not permitted under the contract to do so. To complete the work necessary to extend the box culvert and back fill the drop off would have required Knife River to obtain a change order from TxDOT. The issuance of any change order would have first required the analysis and approval of a TxDOT engineer.

The evidence also showed that there were other alternatives to address the hazard created by the drop off. As with the culvert extension, these alternatives were also not part of the contract. At trial, guard rails were discussed as a means to isolate a hazard, such as a drop off, from traffic. Painting cross-hatching markings on the road shoulder was also discussed as a means to warn motorists of a hazard and to direct motorists away from it. Here, the testimony indicated that it

8

would have been favorable to have cross hatching painted on the road to warn motorists of the narrowing shoulder and to direct motorists away from the drop off. However, the evidence was clear that the contract did not require or permit Knife River to paint cross-hatching on the road, to construct guard rails, or to perform work beyond laying new asphalt and backfilling the road edges.

At the close of evidence, Knife River moved for a directed verdict on Appellee's negligent-undertaking claim. Among its arguments, Knife River asserted that it had no duty to rectify or to warn of the drop off. The trial court denied Knife River's motion.

The case was sent to the jury. The charge asked the jury whether the negligence, if any, of TxDOT or Knife River had caused the death of Hinojosa. With respect to Knife River's negligence, the trial court's jury instruction tracked the essential elements of an undertaking claim as defined in section 324A of the Restatement (Second) of Torts. The jury found that TxDOT's and Knife River's negligence had caused Hinojosa's death. The jury apportioned responsibility as follows: five percent to Knife River and ninety-five percent to TxDOT. The jury answered "no" with respect to whether Hinojosa's death resulted from gross negligence. The jury awarded Appellee damages totaling $4,850,895.33.

Following trial, Appellee filed a motion to disregard the jury's findings with respect to TxDOT's negligence. Appellee asserted that there was no evidence to

9

support the jury's finding that TxDOT's negligence had proximately caused Hinojosa's death and, concomitantly, to support the jury's allocation of ninety-five percent responsibility to TxDOT.

The trial court granted Appellee's motion, setting aside the jury's findings with respect to TxDOT. As a result, the trial court rendered judgment against Knife River in favor of Appellee with Knife River being ordered to pay 100 percent of the damages found by the jury, plus court costs and interest.

This appeal followed. In three issues, Knife River challenges the trial court's judgment, asserting (1) the trial court erred by denying Knife River's motion for directed verdict; (2) the trial court erred by granting Appellee's motion to disregard the jury's findings; and (3) Knife River is entitled to a new trial based on Appellee's failure to adequately plead its negligent-undertaking claim and based on the trial court's improper exclusion of certain evidence and defenses.

**Directed Verdict**

In its first issue, Knife River claims that the trial court erred by denying Knife River's motion for directed verdict. Knife River asserts that no evidence was presented at trial to establish the duty element of Appellee's negligent-undertaking claim asserted under section 324A of the Restatement (Second) of Torts.

**A.      Standard of Review**

When reviewing the grant of a directed verdict, we follow the usual standard for assessing the legal sufficiency of the evidence. *See B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 21 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 821–28 (Tex. 2005)). We determine whether there is any evidence of probative value to raise a material fact issue on the question presented. *Id.* (citing *Bostrom Seating, Inc. v. Crane Carrier Co.*, 140 S.W.3d 681, 684 (Tex. 2004)). We will credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *Id.* (citing *City of Keller*, 168 S.W.3d at 827). A directed verdict in favor of the defendant is proper when "a plaintiff fails to present evidence raising a fact issue essential to the plaintiff's right of recovery." *See Krobar Drilling, L.L.C. v. Ormiston*, No. 01-10-01016-CV, 2012 WL 1564160, at *2 (Tex. App.—Houston [1st Dist.] May 3, 2012, no pet.) (citing *Prudential Ins. Co. of Am. v. Fin. Review Servs., Inc.*, 29 S.W.3d 74, 77 (Tex. 2000)). Stated differently, a directed verdict is warranted when the evidence is such that no other verdict can be rendered and the moving party is entitled, as a matter of law, to judgment. *B & W Supply*, 305 S.W.3d at 21 (citing *Byrd v. Delasancha*, 195 S.W.3d 834, 836 (Tex. App.—Dallas 2006, no pet.)).

## B. Negligent Undertaking

### 1. *Legal principles*

To sustain her negligence claim, Appellee was required to establish that Knife River violated a legal duty owed to Hinojosa. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837 (Tex. 2000). Texas law generally imposes no duty to take action to prevent harm to others absent certain special relationships or circumstances. *See SmithKline Beecham Corp. v. Doe*, 903 S.W.2d 347, 353 (Tex. 1995); *see also* RESTATEMENT (SECOND) OF TORTS § 314 (1965) ("The fact that [an] actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action."). For example, one who voluntarily undertakes an affirmative course of action for the benefit of another has a duty to exercise reasonable care that the other's person or property will not be injured thereby. *See Fort Bend Cnty. Drainage Dist. v. Sbrusch*, 818 S.W.2d 392, 395–96 (Tex. 1991) (citing *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119 (Tex. 1976)).

Appellee claimed that Knife River owed a duty of care to her husband under a negligent-undertaking theory, as defined in Restatement (Second) of Torts section 324A. That section reads as follows:

> Section 324A. Liability To Third Person For Negligent Performance Of Undertaking

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform][2] his undertaking, if

(a)  his failure to exercise reasonable care increases the risk of such harm, or

(b)  he has undertaken to perform a duty owed by the other to the third person, or

(c)  the harm is suffered because of reliance of the other or the third person upon the undertaking.

RESTATEMENT (SECOND) OF TORTS § 324A (1965); *see Torres v. Dilley Youth Athletic Ass'n*, No. 04–11–00439–CV, 2012 WL 3205856, at *2 (Tex. App.—San Antonio Aug. 8, 2012, pet. denied) (mem. op.) (recognizing that Texas courts have adopted section 324A); *see also Poynor v. BMW of N. Am., LLC*, No. 05–10–00724–CV, 2013 WL 3498695, at *5 (Tex. App.—Dallas Feb. 21, 2013, no pet.) (analyzing Section 324A negligent-undertaking claim); *Lowe's Home Ctrs., Inc. v. GSW Mktg., Inc.*, 293 S.W.3d 283, 291 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (same).

---

[2]  In the Restatement (Second), the word "protect" appears rather than the word "perform." Other courts have noted that "[t]he reporter for this edition of the Restatement . . . has verified that the word 'protect' which appears at this point is a typographical error and should read 'perform.'" *Hill v. U.S. Fid. & Guar. Co.*, 428 F.2d 112, 115 n.5 (5th Cir. 1970); *see also Ironwood Springs Christian Ranch, Inc. v. Emmaus*, 801 N.W.2d 193, 199 n.1 (Minn. Ct. App. 2011); *Artiglio v. Corning Inc.*, 957 P.2d 1313, 1317 n.4 (Cal. 1998); *Smith v. Allendale Mut. Ins. Co.*, 303 N.W.2d 702, 706 n.4 (Mich. 1981); *Miller v. Bristol–Myers Co.*, 485 N.W.2d 31, 38 n.7 (Wis. 1992).

As with a simple negligence claim, a negligent-undertaking claim requires proof that the defendant owed the plaintiff a legal duty and violated it. *See Torrington*, 46 S.W.3d at 837. "Any such determination involves the balancing of a variety of factors, 'including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant.'" *Allen Keller v. Foreman*, 343 S.W.3d 420, 425 (Tex. 2011) (quoting *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010)). The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist. *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013) (citing *Torrington*, 46 S.W.3d at 838–39). Appellee asserts that Knife River "acted in a way that requires the imposition of a duty" because, as defined in Section 324A subpart (a), Knife River increased a risk of harm to Hinojosa and, as stated in subpart (b), it undertook to perform a duty owed by the other to the third person. *See* RESTATEMENT (SECOND) OF TORTS § 324A. Appellee claims that Knife River owed her husband a duty of care to rectify the drop off and to provide written notice to TxDOT regarding the defect.

### 2.    *Increased risk of harm*

A defendant may be liable to a plaintiff when, as defined in Section 324A subpart (a), a defendant's failure to exercise reasonable care in rendering the service it has undertaken increases the risk of harm to the plaintiff. *See Poynor*,

14

2013 WL 3498695, at *5–6 (analyzing whether evidence showed that defendant had increased risk of harm to plaintiffs). The Restatement provides an illustration to guide the interpretation of this concept:

> A operates a grocery store. An electric light hanging over one of the aisles of the store becomes defective, and A calls B Electric Company to repair it. B Company sends a workman, who repairs the light, but leaves the fixture so insecurely attached that it falls upon and injures C, a customer in the store who is walking down the aisle. B Company is subject to liability to C.

RESTATEMENT (SECOND) OF TORTS § 324A cmt. c, illus. 1.

The record shows that TxDOT hired Knife River to lay a two-to-three inch layer of asphalt over the existing asphalt on the road. Appellee asserts that Knife River increased the risk of harm to Hinojosa when it added the new asphalt to the highway, which raised the road's height and deepened the drop off by two or three inches.

The decision to apply the new layer over the existing layer was made by TxDOT, as planned and designed by its engineers. At trial, TxDOT's district director of construction, Patrick Williams, explained that the "no exceptions" notation on the front of the construction contract meant that TxDOT required that no portion of the 4.5 mile road section would be excepted from being overlaid with new asphalt. Knife River had no authority or discretion not to overlay any portion of the road or to alter the contract with respect to the overlay.

15

Appellee did not allege or show that the claimed increase in the risk of harm to Hinojosa associated with the raised road height was caused by a faulty, substandard, or incomplete rendition of the overlay work by Knife River. Rather, Appellee intimates that the risk of harm was increased by raising the road height and by the corresponding deepening of the drop off. In other words, the risk was increased by the fact of the overlay itself. However, it was TxDOT which undertook to design, engineer, approve, and require the overlay. Thus, any alleged increase in harm was attributable to TxDOT, not to Knife River. Nothing showed that the alleged increase in the risk of harm resulted from Knife River's failure to use reasonable care in the rendition of the overlay services it had undertaken. And, as discussed, *infra*, the evidence showed that rectifying the drop off and providing written notice of the defect was outside the scope of Knife River's undertaking.

Moreover, it was undisputed that the steep drop off—estimated to be 1.5 feet deep—existed before Knife River began the overlay project. And it is not in dispute that, before the overlay, the drop off was a danger to motorists. Raymond Vasquez testified that he had verbally informed the onsite TxDOT project inspector about the dangerousness of the existing drop off.

Although she asserts that the evidence showed that Knife River's services increased the risk to motorists, Appellee presented no evidence to support this assertion. In her brief, Appellee points to the testimony of Knife River's asphalt

16

manager, Joe Sustaita, in which he indicated that a two to three inch drop was a safety concern. But, when read in context, Sustaita's testimony referred to the fact that, before Knife River put a new layer of asphalt on the highway, there was a preexisting two to three inch drop along portions of the old pavement edge that needed to be addressed. Sustaita was not referring to the post-construction two to three inch height increase along the drop off, which, in its preexisting condition, was already approximately one-and-one-half-feet deep. In other words, Sustaita was not testifying about the effect of the height increase caused by Knife River's placing a new layer of asphalt on the road.

The only evidence specifically addressing this issue showed that the raised height of the road did not increase the risk of harm to Hinojosa. Appellee asked Knife River's corporate representative whether the additional asphalt layer had made the condition more dangerous. The corporate representative indicated that the danger was unchanged by the additional layer of asphalt. Brad Partee, the TxDOT engineer, who designed the project, was also asked whether the additional asphalt increased the risk to the public:

> Q. In your professional opinion as an engineer, your professional judgment, would adding a layer of asphalt to this existing roadway make it dangerous?
>
> [Partee:] No, sir.
>
> Q. Would it increase any risk at all to the motoring public?
>
> A. No, sir.

17

Given the record, we conclude that Knife River did not owe Hinojosa a duty to address the drop off pursuant to subpart (a) of Section 324A. The evidence showed that the drop off existed in a dangerous condition before Knife River began work and no evidence showed that Knife River's failure to act with reasonable care increased that danger.

### 3.    *Undertaking duty owed to third person*

Appellee also claims that Knife River is liable under subpart (b) of Section 324A, which provides that a defendant may be liable when it has undertaken to perform a duty owed by another to a third person. *See* RESTATEMENT (SECOND) OF TORTS § 324A(b). Appellee alleged that Knife River undertook TxDOT's duty owed to the motoring public to make the roadway safe when Knife River agreed to backfill the road edges to a 3:1 gradient. However, section 324A imposes a duty to perform without negligence only the task that the actor has undertaken to accomplish. *See Lowe's Home Ctrs.*, 293 S.W.3d at 291; *see also Sbrusch*, 818 S.W.2d at 397.

We ask: Did Knife River undertake to make the 1.7 foot drop off comply with the 3:1 slope requirement? Appellee says "yes" and cites the project plan, which states as follows: "No edge drop offs exceeding 3:1 shall be left exposed to traffic. Backfilling these areas shall be considered incidental to the various forms of work." Appellee points out that the project plans state, "No Exceptions." It also

points out that Knife River agreed do "all the work necessary for the highway improvement as shown and described in the plans and in accordance with the referenced specifications and special provisions which are a part of this contract." Appellee asserts that, without any exceptions, Knife River had a duty under the contract to make all drop offs compliant with the 3:1 slope requirement, regardless of whether compliance was possible within the scope of the work permitted under the contract.

The Supreme Court of Texas has stated that the critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant *acted in a way* that requires the imposition of a duty where one otherwise would not exist. *Nall*, 404 S.W.3d at 555. Here, by entering into the construction contract with TxDOT to resurface the road and to backfill drop offs incidental to that work, Knife River did not act in a way that requires an imposition of a duty to rectify the 1.7 foot drop off involved in this case.

By agreeing to backfill edge drops incidental to the resurfacing work, Knife River contracted to backfill the edge drops associated with that work and to ensure that those edge drops met the 3:1 slope requirement. The evidence shows that backfilling the preexisting drop off, into which Hinojosa's tire fell, was not contemplated by Knife River or by TxDOT when they entered into the construction contract. Simply backfilling the drop off was not feasible because, as

19

a number of witnesses testified, the backfill material would block the culvert. Instead, backfilling the drop off required extending the box culvert, an act that was outside the scope of the construction contract, and would necessitate TxDOT's engineering judgment and its approval. The only evidence at trial specifically addressing the meaning of the contract's "no exceptions" phrase indicated that the phrase referred to TxDOT's requirement that no part of the road be excluded from being overlaid with new asphalt.

In addition, the project plans did not mention the several box culverts found within the section of the highway covered by the project or address whether the edge drops existing above these culverts could be made compliant with a 3:1 slope. The evidence did show that the edge drop involved in this case was steeper, more dramatic, more dangerous, and more concealed than the edge drops at the other culvert locations. However, it was not in dispute that TxDOT knew that a 3:1 gradient could not be achieved at any of the box culvert locations. TxDOT made the decision before the project began that no additional work would be done at any of the culverts lying within the 4.5 mile section of road included in the project.

At trial, representatives from Knife River and TxDOT made clear that neither party to the contract intended to impose a duty on Knife River to rectify the drop off. Rather, TxDOT viewed this simply as an "overlay contract," as explained by Patrick Williams, TxDOT's director of construction for the district,

20

who ultimately approved and accepted Knife River's work. He described the contract as an "overlay," and testified as follows: "It's preventive maintenance. It's just to improve the ride or add a little strength to the pavement structure itself and all and give it a little bit more surface life. It doesn't address safety issues." When asked why he was not critical of Knife River's work, even though it had not achieved a 3:1 slope at the drop off, Williams gave the following testimony:

A. Because again, it wasn't part of the contract and there's—had extensive work to be done to get rid of that drop-off.

Q. . . . And what would be some of the extensive work that would have to be done?

A. Well, the culvert would have to be widened, but before you did that you'd have to go in there and do an environmental study first and get all the environmental clearance before that was done.

Q. And there was nothing . . . about Knife River's project here at this location that required them to widen the culvert, agreed?

A. Agreed.

In short, the additional work required to achieve a 3:1 gradient at the drop off was outside the scope of the contract and was not contemplated by the parties. It would be illogical to conclude, then, that Knife River's agreement to backfill edge drops incidental to its overlay work constituted an undertaking by Knife River to backfill the preexisting one-and-one-half foot drop off to a 3:1 gradient.

We also note that courts in other jurisdictions have recognized that for liability to be imposed under section 324A(b), a party "must completely assume a

21

duty owed by [another] to [the third person]." *Hutcherson v. Progressive Corp.*, 984 F.2d 1152, 1156 (11th Cir. 1993); *see also Ironwood Springs Christian Ranch, Inc. v. Walk to Emmaus*, 801 N.W.2d 193, 202 (Minn. Ct. App. 2011) (stating that, "to impose liability under section 324A(b), one who undertakes a duty owed by another to a third person must completely assume the duty"); *Plank v. Union Elec. Co.*, 899 S.W.2d 129, 131 (Mo. Ct. App. 1995) (concluding that "one must intend to completely subsume or supplant the duty of the other party in order to incur liability for nonperformance of that duty"); *Obenauer v. Liberty Mut. Ins. Co.*, 908 F.2d 316, 317 (8th Cir. 1990) (concluding that an insurer providing safety services to a manufacturer was not liable under Section 324A to the user of a manufactured product because the insurer did not "replace" the manufacturer's duty to design a safe product); *Furek v. Univ. of Del.*, 594 A.2d 506, 515–16 (Del. 1991) (recognizing that Section 324A(b) applies "only when one undertakes to supplant the duty of another owed to a third person"); *Davis v. Liberty Mut. Ins. Co.*, 525 F.2d 1204, 1207–08 (5th Cir. 1976) (requiring that party with original duty completely "delegate[ ]" the duty to the undertaking party for the undertaking party to be liable under subsection (b)).  Here, the evidence showed that TxDOT was responsible for the maintenance and safety of Texas roads, including the highway where the accident occurred.  Even though Knife River contracted to provide backfill services incidental to the overlay work, no evidence showed that TxDOT

22

relinquished its duty to maintain the road's safety when it entered into the overlay contract with Knife River. TxDOT retained that duty.

Appellee also relies on section 4.3 of the TxDOT specifications incorporated into the project plans. That provision required Knife River to give written notice to TxDOT when Knife River encountered differing or latent conditions not addressed by the project plans. Appellee points to that provision and to Knife River's conduct of obtaining a change order from TxDOT for additional backfill material as conduct giving rise to a duty to rectify the 1.7 foot drop off. Appellee also asserts that section 4.3 gave rise to a duty for Knife River to send TxDOT written notice when it discovered the drop off.

Section 4.3 of the specifications provides:

4.3.   Differing Site Conditions. During the progress of the work, differing subsurface or latent physical conditions may be encountered at the site. The two types of differing site conditions are defined as:

• those that differ materially from those indicated in the Contract and

• unknown physical conditions of an unusual nature differing materially from those ordinarily encountered and generally recognized as inherent in the work provided for in the Contract.

Notify the [TxDOT] Engineer in writing when differing site conditions are encountered. The Engineer will notify the Contractor when the Department discovers differing site conditions. Unless directed otherwise, suspend work on the affected items and leave the site undisturbed. The Engineer

23

> will investigate the conditions and determine whether differing site conditions exist. If the differing site conditions cause an increase or decrease in the cost or number of working days specified for the performance of the Contract, the Engineer will make adjustments, excluding the loss of anticipated profits, in accordance with the Contract. Additional compensation will be made only if the required written notice has been provided.

Nothing in section 4.3 indicates that the purpose of providing written notice to TxDOT was to address safety issues. Nor does it indicate that the provision was for the benefit or protection of third parties. Rather, from its language, the notice provision is designed to address compensation issues and to provide a means by which a TxDOT contractor may obtain additional compensation for work undertaken to complete a project. Section 4.3 did not give rise to a duty for Knife River to send written notice to TxDOT. The notice requirement arose from contractual duties owed between the parties regarding payment. It does not contemplate a duty that TxDOT owed to a third party. *See* RESTATEMENT (SECOND) OF TORTS § 324A(b) (imposing undertaking liability when a party has undertaken to perform a duty owed by another to a third person).

Consistent with section 4.3, Knife River did, as Appellee points out, seek a change order for additional backfill material. Knife River had originally underestimated the amount and cost of the backfill material needed incidental to the overlay work. Knife River obtained the change order so that it would be paid for the backfill material it needed for the project. However, this conduct did not

give rise to a duty for Knife River to obtain a change order to extend the box culvert. Backfilling the edge drops incidental to the overlay work with backfill material was within the scope of the construction contract. Extending the culverts was not part of the agreement. Thus, neither section 4.3 requiring written notice nor Knife River's act of obtaining a change order for additional backfill material constitute undertakings giving rise to a duty to obtain a change order to rectify the 1.7 foot drop off.

In short, to the extent that it undertook to backfill edge drops incidental to its overlay work, making safe the preexisting steep drop off above the culvert, into which Hinojosa's tire fell, was outside the scope of that undertaking. No evidence was presented to show otherwise. Because Restatement section 324A imposes a duty to perform without negligence only the task that the actor has undertaken to accomplish, Knife River owed no duty—as a matter of law—to rectify the drop off or to provide written notice regarding the defect. *See Lowe's Home Ctrs.*, 293 S.W.3d at 291; *see also Sbrusch*, 818 S.W.2d at 397.

We conclude that Knife River was entitled to a directed verdict on Appellee's negligent-undertaking claim. We hold that the trial court erred when it denied Knife River's motion for directed verdict.

We sustain Knife River's first issue.[3]

## Conclusion

We reverse the judgment of the trial court and render a take-nothing judgment against Appellee.

Laura Carter Higley
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

---

[3] Because of the disposition of this issue, we need not reach Knife River's second and third issues.