Opinion issued February 27, 2020



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-18-00136-CV

————————————

**TONYA BAUER, AS GUARDIAN OF THE PERSON AND ESTATE OF EMILY BAUER, AN INCAPACITATED PERSON, Appellant**

**V.**

**GULSHAN ENTERPRISES, INC., Appellee**

---

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Case No. 2014-71024-B**

---

## DISSENTING OPINION

I respectfully dissent. The majority affirms summary judgment in favor of

appellee Gulshan Enterprises, Inc. against Tonya Bauer, guardian of Emily Bauer,

an incapacitated person. I would reverse and remand this case for trial on the merits of Bauer's negligent undertaking claim.

The essential issue in this case is whether Gulshan owed a duty of reasonable care to Emily Bauer, a customer of the "Phillips 66" service station and Handi-Stop #79 on Huffmeister Road in Houston, Texas, to which Gulshan marketed ConocoPhillips branded gas. In resolving this issue, we must first determine whether Gulshan by agreement with ConocoPhillips undertook a duty not to permit the sale of illegal drugs and drug paraphernalia on the premises of the Phillips 66 service station and the Handi-Stop to protect the reputation and good will of ConocoPhillips by protecting the community and customers of the store from harm. If Gulshan did assume such an undertaking, then it owed Emily a duty of reasonable care in performing the undertaking if: (1) it assumed the undertaking in performance of a duty that ConocoPhillips owed to its customers and the community; (2) its assumption of the undertaking prevented ConocoPhillips from taking action itself; or (3) its failure to use reasonable care in performing the undertaking increased the risk to the community and customers of the station and convenience store that teenagers living in the community—including Emily Bauer, the victim of this story, and her friends—would purchase the illegal synthetic marijuana openly displayed in the Handi-Stop, smoke it, and suffer grave physical harm, as Emily did.

I would hold that, by written agreement with ConocoPhillips, Gulshan expressly undertook a duty of reasonable care to ensure that illegal drugs are not sold on the premises of the Phillips 66 service station and the Handi-Stop. I would further hold that the Bauer family has raised a material fact issue as to whether Gulshan breached that duty by permitting the exact activity that gravely injured Emily and by not notifying ConocoPhillips of that ongoing activity the Handi-Stop so that it could take steps to protect the community and its own reputation.

The majority, however, resolves the duty issue in the negative despite the plain language of the "Branded Marketer Agreement" between Gulshan and ConocoPhillips (the BMA). It declares that there is no evidence that Gulshan assumed and breached any duty owed to the community and customers of the Handi-Stop and thereby increased the risk, foreseeability, and likelihood of injury to members of the community and customers of the Handi-Stop, including Emily Bauer.

I read the majority's holding as directly contrary to the plain language of the "Branded Marketer Agreement" between Gulshan and ConocoPhillips. The BMA branded the service station that housed the Handi-Stop as a ConocoPhillips service station and imposed strict duties on the marketer of ConocoPhillips gasoline to the station, Gulshan. These contractual duties expressly included the duty not to permit the Handi-Stop to sell illegal drugs and drug paraphernalia in order to protect

ConocoPhillips' good name by protecting the station's and the Handi-Stop's customers from harm.

I also read the majority opinion as conflating simple common-law negligence, premises liability, and negligence in performing an undertaken duty. I would apply the law of negligent undertaking as Bauer pleaded it, and I would conclude as a matter of law that Gulshan assumed a duty of reasonable care not to permit the illegal activities of the sale of synthetic marijuana and drug paraphernalia on the premises of the service station and the Handi-Stop. *See Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 767 (Tex. 2010) ("Whether a duty exists is a question of law for the court and turns 'on a legal analysis balancing a number of factors, including the risk, foreseeability, and likelihood of injury, and the consequences of placing the burden on the defendant.'") (quoting *Gen. Elec. Co. v. Moritz*, 257 S.W.3d 211, 217, 218 (Tex. 2008)). I would then hold that Bauer has raised material fact issues with respect to whether Gulshan breached its duty and whether that breach caused Emily Bauer's injuries. Finding evidence to support each element of Bauer's negligent undertaking claim, I would hold that Gulshan failed to establish its right to summary judgment.

I would reverse the trial court's summary judgment in favor of Gulshan and remand the case for trial on the merits.

4

**Background**

The majority is generally correct in its statement of the facts of the case and the standard of review of no evidence and traditional summary judgment. However, it omits the standard of review of the central question here—the existence of a duty. *See Black + Vernooy Architects v. Smith*, 346 S.W.3d 877, 882–83 (Tex. App.—Austin 2011, pet. denied) ("[A]ppellate courts review de novo a determination regarding whether a legal duty is owed."). It also omits material facts essential to the application of the correct law to this case, and it conflates and misapplies the standard of review of common-law negligence, premises liability, and negligent undertaking. I restate and supplement only those facts that are material to this analysis of Gulshan's liability to Bauer on a negligent undertaking liability theory. And I restate the standard of review as it applies to the contractual undertaking of a duty to a party to a contract or to a third party.

As detailed in the majority opinion, Gulshan had a complex and ongoing business relationship both with ConocoPhillips, whose gasoline it delivered and received payment for, on the one hand, and with the owners and operators of the Handi-Stop, on the other. I will not repeat those material facts.

Critical to this analysis, however, is the BMA executed by ConocoPhillips and Gulshan, which I review de novo. The interpretation of an unambiguous contract is a question of law that appellate courts review de novo using well-settled contract-

5

construction principles. *See URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018) (holding that interpretation of unambiguous contract is question of law that is reviewed de novo). Under the terms of the BMA, ConocoPhillips agreed to sell its branded gasoline to Gulshan, as "Marketer." Gulshan could then sell ConocoPhillips' gasoline through stations ConocoPhillips owned or operated, or he could sell it to independent dealers who owned or operated service stations (Marketer Supplied Dealers). Also in the BMA, ConocoPhillips granted Gulshan a license to use certain ConocoPhillips brand names in the advertising, distribution, and sale of gasoline and to display ConocoPhillips' brand identification and signage at the stations Gulshan supplied. Gulshan's name was also prominently displayed above the entrance door to the Handi-Stop.

Pertinent to this litigation, the recitals in the BMA stated that ConocoPhillips had a protectable business interest in ensuring that Gulshan's sales and distributions of ConocoPhillips products would be accomplished in a manner respecting the standards, reputation, and integrity of the ConocoPhillips brands. And, in Section 4(B), the BMA reserved to ConocoPhillips the right to revoke its approval to use the ConocoPhillips brand at stores that "fail[ed] to conform the Marketer Supplied Outlet to ConocoPhillips' then-current Brand and Image Standards and requirements set forth in Section 5."

6

The "Brand and Image Standards" set forth in Section 5 of the BMA required that Marketers—here Gulshan—and their Marketer Supplied Outlets—here Handi-Stop #79—and Marketer Supplied Dealers—here Bin Enterprises, Inc., the owner of Handi-Stop #79—uphold certain standards reflecting on the reputation of ConocoPhillips in the community. These included treating all persons fairly, honestly, and courteously; providing efficient service to consumers; properly addressing consumer complaints; keeping the building and grounds clean; operating with well-groomed personnel; and operating during certain business hours.

Most pertinently, Section 5(D) of the BMA, on which Bauer relies, provided:

Consistent with the principles herein set forth, . . . *[Gulshan] shall conduct its independent business operations in compliance with the standards set forth below,* which will promote the continuing good reputation of ConocoPhillips and all other branded ConocoPhillips marketers. *[Gulshan] shall ensure to ConocoPhillips that all Marketer Supplied Outlets [such as Handi-Stop #79] and the Marketer Supplied Dealers [such as Bin, the owner of Handi-Stop #79] shall also comply* with these standards.

. . . .

(D)     *Each Marketer Supplied Outlet [Handi-Stop #79] must complement the community* and the environment. Furthermore, *[Handi-Stop #79] must not engage, permit, or cooperate in any conduct that reflects unfavorably on the reputation of ConocoPhillips in the community served by [Gulshan], or in ConocoPhillips' opinion impairs the goodwill associated with the ConocoPhillips Brands*, or constitutes a deceptive or unfair trade practice under applicable laws. *[Gulshan] shall cooperate, and shall take reasonable steps to ensure that the operators of each Marketer Supplied Outlet, its Marketer Supplied Dealers, its employees, vendors, contractors[,] and agents cooperate, fully with the performance of [Gulshan's] obligations under this*

7

> *[BMA] . . . . [Gulshan] shall not permit on, in[,] or from [Handi-Stop #79]:*
>
> i. price gouging . . . ;
> ii. any illegal consumption of intoxicating beverages;
> iii. *the sale or use of illegal drugs or drug paraphernalia*;
> iv. the sale of tobacco . . . or alcoholic beverages to minors . . . ; or
> v. any offensive merchandise . . . .

(Emphasis added.)

In addition, Section 5(G) set forth the terms of the mandatory Brand and Image Standards program, which "evaluate[d] the implementation of the Brand and Images Standards at the Marketer Supplied Outlets." As part of the program, evaluations of Marketer Supplied Outlets would be "communicated through an evaluation form completed by ConocoPhillips or its designee." If a Marketer Supplied Outlet like Handi-Stop #79 failed an evaluation, the Marketer—Gulshan— was obligated to take prompt action to correct the deficiencies identified on the evaluation form. If a Marketer Supplied Outlet had "repeated failing evaluations or repeated or habitual Brand and Image Standards deficiency failures," ConocoPhillips had the right to assess a fee against the Marketer or to debrand the Marketer Supplied Outlet.[1]

---

[1] The majority translates this limited right of evaluation into a generalized and incorrect claim that "the BMA assigns the duty to inspect Handi-Stop for compliance with the Brand and Image Standards to ConocoPhillips, not to Gulshan." Slip Op at 21. The majority opines generally, "Importantly, Bauer concedes in her appellate brief that 'Gulshan was not obligated to inspect stores under the BMA.'" Slip Op. at 21. That claim is incorrect and misleading. Gulshan's

8

Finally, Section 5(J) of the BMA provided that, if the Marketer failed to comply, or to ensure compliance, with the Brand and Image Standards, ConocoPhillips could assess fees against that Marketer or, if the failure to comply involved multiple Marketer Supplied Outlets, terminate the BMA:

> *[Gulshan] specifically understands and agrees that the Brand and Image Standards are reasonable and of material significance to this [BMA] and to the consumers who patronize Marketer Supplied Outlets . . .* [Gulshan] further understands and will ensure that its Marketer Supplied Dealers [like the Handi-Stop] understand and acknowledge that it is reasonable for ConocoPhillips to debrand any Marketer Supplied Outlet which does not comply with this Section 5, or to terminate this [BMA] in its entirety where the violation involves multiple Marketer Supplied Outlets, upon written notice.

(Emphasis added.)

Despite the emphasis in the BMA on Gulshan's responsibility to ensure that ConocoPhillips' Brand and Image Standards were observed not only by itself but by the Marketer Supplied Outlets that it served, like Handi-Stop #79, and the Marketer Supplied Dealers, like Bin, the summary judgment record shows that Gulshan failed in its obligation to take reasonable steps to ensure full cooperation with its mandatory obligation under the BMA to uphold ConocoPhillips' Brand and Image

---

duty not to permit certain activities on the premises of any Marketer Supplied Outlet, including the sale of illegal drugs and drug paraphernalia at the Handi-Stop, necessarily implied a duty of reasonable care to inform itself as to whether any sales of illegal drugs and drug paraphernalia were being conducted in the Handi-Stop and then not to permit those activities.

Standards at the Handi-Stop. And specifically, it failed in its obligation not to permit the sale of illegal drugs and drug paraphernalia.

The record shows that the Handi-Stop was well known to Emily and the other teenagers in the neighborhood for selling illegal synthetic marijuana and drug paraphernalia throughout 2011 and 2012. The synthetic marijuana came in varying strengths and flavors such as grape, strawberry, and pineapple. The packages of synthetic marijuana available for purchase at the store were in plain sight. As a friend of Emily Bauer testified by affidavit, "The bags or brands of synthetic marijuana, such as Kush, Klimax, Cloud 9 and Dopey, were taped to the inside of the dividing window by the cash register so customers could see what was available for purchase." This friend also testified that other drug paraphernalia, including bongs, pipes, and grinders, was in plain sight by the cash register at all times. This was the case on December 7, 2012, when Emily and her friends visited the store and purchased one package of "Kush" synthetic marijuana and one package of "Klimax" synthetic marijuana, which Emily smoked that night.

Emily's boyfriend also testified by deposition to the same facts. He was with Emily the day the synthetic marijuana that caused her harm was purchased and in the evening, when she smoked it. He also testified that the Handi-Stop had a "Smoke Shop" sign outside, and he defined a smoke shop as a shop that "sells cigars, glassware, occasionally cigarettes." He further testified that "glassware" means

10

"bongs and pipes, grinders," and that grinders are used to grind up marijuana so that it can be rolled into a cigar. He also testified that once synthetic marijuana became illegal the only local place it could be bought in the community was "the Phillips 66" where Handi-Stop #79 was located. On the day Emily had her massive strokes and heart attack, she and her friends had smoked the synthetic marijuana bought that day at the Handi-Stop and had used no other type of drugs.

## Summary Judgment Standard of Review

In her sole issue, Bauer argues that the trial court erred in granting Gulshan's motion for no-evidence summary judgment on her negligence claim because she presented more than a scintilla of evidence on each of the challenged elements of her claim. *See* TEX. R. CIV. P. 166a(i) (setting forth requirements for no-evidence summary judgment). I adopt the majority's statement of summary judgment law, but restate the law of negligent undertaking as set out below.

## Negligent Undertaking

Bauer pleaded this case as a simple negligence case, a negligent undertaking case, and also a premises liability case—only to abandon her premises liability theory and to rely upon her negligent undertaking theory as the basis of Gulshan's liability to her. I agree that this is a negligent undertaking case.

11

**A. Assumed duty to the other party to an agreement**

The supreme court addressed the law of negligent undertaking with respect to liability to a party to an agreement in which a duty to the other party is undertaken in *Torrington Company v. Stutzman*. *See* 46 S.W.3d 829, 838–39 (Tex. 2000). In *Torrington*, the plaintiffs brought a wrongful death and survival suit against the manufacturer of a Navy helicopter that crashed, killing two Marines, and against the manufacturer of the failed ball bearing that caused the crash. *Id.* at 833. Following a jury verdict in favor of the survivors submitted on a broad-form negligence question, the ball bearing manufacturer appealed. *Id.* The central issue was whether the ball bearing manufacturer had undertaken a duty to its customers to investigate and identify potentially defective bearings. *Id.* at 836.

The *Torrington* court held that the survivors' negligent undertaking theory failed in that case because it had been improperly submitted to the jury, and it reversed the jury verdict in favor of the survivors on the ground that "the broad-form negligence question [submitted to the jury] omitted elements necessary to establish an undertaking claim." *Id.* at 839. However, rather than render judgment against the survivors, the court remanded the case to the trial court, explaining that "we have remanded in the interest of justice when our decisions have altered or clarified the way in which a claim should be submitted to the jury." *Id.* at 840.

The *Torrington* court observed that, years before, in *Colonial Savings Association v. Taylor*, 544 S.W.2d 116, 120 (Tex. 1976), the supreme court had adopted section 323 of the Restatement (Second) of Torts, which states the law of negligent undertakings in suits brought by a party to an agreement against another party alleged to have undertaken a duty to the injured party:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* at 337–38 (quoting Restatement (Second) of Torts § 323 (1965)); *see Colonial Savs.*, 544 S.W.2d at 120 (same). The *Colonial Savings* court stated,

> The rule as stated in Section 323 of the Restatement, quoted above, imposes liability for injuries caused by the negligent performance of a gratuitous undertaking, if (a) the actor's negligence has increased the risk of physical harm, or (b) the injured party has relied upon the undertaking.

544 S.W.2d at 120 (holding that lienholder that had undertaken to provide fire insurance coverage for structures on property in which it held security interest had duty to exercise reasonable care to perform that undertaking, but finding that lienholder had not increased risk of fire by failing to insure structure that sustained fire damage).

13

Thus, *Torrington* and, before it, *Colonial Savings* set out the law of negligent undertaking when the defendant has undertaken to render services to another party "which he should recognize as necessary for the protection of the other's person or things" and performs that duty negligently. *See* RESTATEMENT (SECOND) OF TORTS § 323; *Torrington*, 46 S.W.3d at 838; *Colonial Savs.*, 544 S.W.2d at 120. In this case, section 323 sets out the law with respect to a claim against Gulshan made by ConocoPhillips for Gulshan's failure to perform its obligations to ConocoPhillips undertaken in the BMA.

## B.    Assumed duty to a third party

However, neither *Torrington* nor *Colonial Savings* sets out the law of negligent undertakings for those cases in which the breach of an undertaken duty leads to an injury to a *third party* rather than to the party with whom the defendant has contracted, gratuitously or for pay, to provide services. That important gloss to negligent undertaking law was added by the Dallas Court of Appeals well after *Colonial Savings* but before *Torrington* in *Seay v. Travelers Indemnity Company*, 730 S.W.2d 774, 775–78 (Tex. App.—Dallas 1987, no writ).

In *Seay*, a hospital maintenance worker was killed when a safety valve on a boiler adjacent to the boiler he was working on at Gaston Episcopal Hospital discharged scalding water onto him. *Id.* at 775. His wife and children brought a wrongful death and survival suit against Travelers Indemnity Company, which had

14

insured the hospital, alleging that Travelers had undertaken to inspect the boiler that injured Seay and that it had performed its duty negligently, causing Seay's injuries. *Id.* The boiler was subject to the provisions of the Texas Boiler Inspection Act, which required periodic inspections and safety certification as a condition to the boiler's operation. *Id.* If the boiler met the requirements of the Department of Labor and Standards, the Commissioner would issue a "certificate of operation," allowing the boiler to be lawfully used; and, if not, the Commissioner could order the owner to repair the boiler, prohibit its use, or, in extreme instances, condemn it. *Id.*

Mrs. Seay argued that, as a result of undertaking to inspect the boilers at Gaston, Travelers owed a duty to Mr. Seay pursuant to the common law and to section *324A* of the Restatement (Second) of Torts to exercise ordinary care in inspecting the boilers. *Id.* Travelers denied that it had any duty to Seay. *Id.* at 776. The court of appeals held that "section 324A accurately describes the scope of the duty owed by one undertaking a task necessary to the protection of a third person, and . . . the rule stated therein is the law in the State of Texas." *Id.* at 777. It then held that the burden was on Travelers, as summary judgment movant, to disprove at least one element of Mrs. Seay's claim as a matter of law and that it had failed to do so. *Id.* 777–80.

The court of appeals reversed the summary judgment in favor of Travelers. It held that Travelers had been hired by Gaston to perform the legally mandated

15

inspections "designed to promote the safety of boilers," and the evidence "fail[ed] to disprove that Travelers was performing a duty of care owed by Gaston to its employees, including the decedent." *Id.* at 780. It further held that material fact issues were raised as to whether there were specific safety standards that must be met for the certificate of operation to issue and whether Travelers knew that there was "a specific standard applicable to the exact danger which was material to Mrs. Seay's cause of action." *Id.* Finally, the court held that Travelers had not proved as a matter of law that it had no means of enforcing compliance with the safety standards of the Boiler Inspection Act, under which a report by Travelers finding the safety valves on the boiler to be dangerous would have been "expected to initiate enforcement procedures compelling the very repairs and alterations which were actually undertaken by Gaston once the death of Mr. Seay alerted Gaston officials to the danger." *Id.*

The *Seay* court—like the supreme court in *Tarrington* after it—observed that the Texas Supreme Court had adopted section 323 of the Restatement (Second) of Torts in *Colonial Savings* as long ago as 1976—a ruling later to be reaffirmed in *Torrington*. And it further observed that the Texas Supreme Court had *also* adopted, in *Fox v. Dallas Hotel Company*, 240 S.W. 517, 520–21 (Tex. 1922), the rule underlying section *324A* of that Restatement. *Id.* at 776 (regarding the duty owed to

16

a *third party* by one who has undertaken a contractual duty he should recognize as necessary to protect the third party). The court stated,

Section 324A of the Restatement (Second) of Torts provides:

*One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to* [*perform*][2] *his undertaking*, if

    (a) his failure to exercise reasonable care increases the risk of [such] harm, or

    (b) he has undertaken to perform a duty owed by the other to the third person, or

    (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

*Id.* at 775–76 (quoting RESTATEMENT (SECOND) OF TORTS § 324A (1965)) (emphasis added).

The *Seay* court held that section 324A and *Fox* controlled the disposition of Seay's case in that Seay, like Fox, was a third party injured by the breach of a duty owed to another that the defendant should have recognized as important for the third party's protection. The *Seay* court pointed out that, in *Fox*, the defendant, Dallas Hotel Company, had entered into a contract to maintain and repair elevators in a

---

[2]    As this Court has previously noted, the word "protect" appearing in section 324A of the Restatement (Second) of Torts is a typographical error and should read "perform." *Knife River Corp.-S. v. Hinojosa*, 438 S.W.3d 625, 632 n.2 (Tex. App.—Houston [1st Dist.] 2014, pet. denied).

building under the control of the employer of Fox, who was killed by an elevator in the building. *Id.* at 776 (citing *Fox*, 240 S.W. at 520). Holding that Dallas Hotel Company was liable to the Fox family in tort, the supreme court stated, "Upon [the defendant] taking over the control and repair of the elevators . . . it became charged with the duty . . . to exercise ordinary care . . . " to protect third parties like Fox. *Fox*, 240 S.W. at 520.

The *Seay* court opined, "The [Texas Supreme] Court's discussion [in *Fox*] makes clear that the basis of liability, like that of section 324A, accrues when the tortfeasor undertakes to perform services for another which are 'attended by grave risks' and which constitute a duty owed by the other to a third person." *Seay*, 730 S.W.2d at 776. Thus, in *Fox*, Dallas Hotel Company's liability accrued when it undertook to maintain the elevators for Fox's employer, satisfying subsection 324A(b) of the Restatement. *See Fox*, 240 S.W. at 518–21. In addition, Dallas Hotel Company had negligently failed to exercise ordinary care in maintaining the elevators, increasing the risk that Fox would be killed by an elevator the Hotel Company had undertaken to maintain, satisfying subsection (a) of section 324A. *See id.* Both Fox and his employer had relied on the elevators' being properly maintained as Dallas Hotel Company had promised, satisfying subsection (c) of section 324A. *See id.* Thus, all three alternative bases of Dallas Hotel Company's liability to a third person for negligently performing its assumed duty were satisfied. *See id.*

18

The *Seay* court emphasized that "Section 323 [of the Restatement (Second) of Torts] is identical to section 324A except that the duty delineated in section 323 extends to the person for whom the services were rendered rather than to the third party described in section 324A." *Seay*, 730 S.W.2d at 776. It then further opined, "This distinction will not impede recognition of section 324A as law inasmuch as Texas courts have repeatedly recognized that existence of a duty will not be defeated by the fact that the duty is claimed by a third party not in privity with the transaction giving rise to the tort." *Id.* (citing Texas Supreme Court and appellate court cases). The court concluded, "The adoption of section 323 necessarily implies the validity of section 324A as Texas law." *Id.* at 777 (citing, among others, *City of Denton v. Van Page*, 701 S.W.2d 831, 836 (Tex. 1986)).

The *Seay* court set out the proof required to establish liability for a negligent undertaking claim under section 324A of the Restatement. *Id.* at 778. Specifically,

> Mrs. Seay [the plaintiff] must first show that Travelers [the defendant] undertook to render services to Gaston [the party for whom Travelers undertook an obligation to render services] and then must show at least one of the following three things: (1) that the risk of harm to Seay [the injured party] increased due to the failure of Travelers to exercise reasonable care; (2) that Travelers undertook to perform a duty owed to Seay by Gaston; or (3) that the harm suffered by Seay was the result of his reliance or Gaston's reliance on the services rendered to Gaston by Travelers.

*Id.* This is the law that is pertinent here.

19

In 2013, in *Nall v. Plunkett*, the Texas Supreme Court reaffirmed that section 324A provides the rule for liability to a third person for negligent performance of an undertaking. 404 S.W.3d 552, 555–56 (Tex. 2013). The issue in *Nall* was whether the Nalls (hosts at a party) owed a duty to protect a guest, Plunkett, who was injured trying to prevent another guest from driving drunk after leaving the party. *Id.* at 554. The supreme court ultimately found no such duty in that case, but the case is important for its analysis of Plunkett's claims, which is applicable here where the injury from negligent undertakings was to a third party, Emily Bauer. *See id.* at 555–56.

The supreme court construed Plunkett's petition as alleging both a negligent undertaking claim and a premises liability claim, but it explored only the negligent undertaking claim. *Id.* at 555–57. The supreme court stated, "The critical inquiry concerning the duty element of a negligent-undertaking theory is whether a defendant acted in a way that requires the imposition of a duty where one otherwise would not exist." *Id.* at 555. It cited *Torrington* as holding "that a jury submission for a negligence claim predicated on a negligent-undertaking theory requires a broad-form negligence question accompanied by instructions detailing the essential elements of an undertaking claim." *Id.* (citing *Torrington*, 46 S.W.3d at 838–39).

Citing Restatement section 324A as "providing the rule for liability to a third person for negligent performance of an undertaking," the court continued,

[T]he broad-form submission for a typical negligence claim and a negligent-undertaking claim is the same, except that an undertaking claim requires the trial court to instruct the jury that a defendant is negligent only if: (1) the defendant undertook to perform services that it knew or should have known were necessary for the plaintiff's protection; (2) the defendant failed to exercise reasonable care in performing those services; and either (a) the plaintiff relied upon the defendant's performance, or (b) the defendant's performance increased the plaintiff's risk of harm.

*Id.* at 555–56. This is the law determinative of Gulshan's liability in this case.

### Application of the Law of Negligent Undertaking to This Case

This case is essentially identical to *Seay* in that the controlling issue is the duty of protection owed to a third person by a party that has assumed a duty of reasonable care in performing services under a contract with another that it knows or should know are necessary for the protection of a third party—the third party here being, the members of the community and customers of the Handi-Stop, including Emily Bauer.

Because this is a summary judgment case, and not, at this stage, a jury trial, Gulshan was required to disprove at least one element of Bauer's negligent undertaking claim as a matter of law, or, alternatively, Bauer was required to raise a material fact issue as to each challenged element of her negligent undertaking claim. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017). I would hold that Gulshan failed to bear its burden and that Bauer has borne hers.

21

To avoid summary judgment in favor of Gulshan on her negligent undertaking claim under Restatement (Second) of Torts section 324A, adopted by *Fox*, *Seay*, and *Nall*, Bauer was required to raise a genuine issue of material fact as to whether, under the BMA, Gulshan assumed a duty to render services to ConocoPhillips to "complement the community and the environment," including a duty not to permit "the sale or use of illegal drugs or drug paraphernalia" on the premises of the Phillips 66 station and the Handi-Stop and whether it assumed a duty to "take reasonable steps to ensure that the operators of each Marketer Supplied Outlet, its Marketer Supplied Dealers, its employees, vendors, contractors, and agents cooperate fully" with its performance of its obligation not to permit the sale of illegal drugs on the premises. That Gulshan did assume these duties is shown by the plain language of the BMA. Accordingly, I would hold that Gulshan expressly assumed a duty of reasonable care not to permit the sale of illegal drugs on the premises in the BMA. And I would further hold that Bauer has raised a material fact issue as to whether Gulshan breached its assumed duties.

Specifically, Gulshan promised in the BMA to ensure that the Handi-Stop's owners and operators did "not engage, permit, or cooperate in any conduct that reflects unfavorably on the reputation of ConocoPhillips in the community served by [Gulshan], or in ConocoPhillips' opinion impairs the goodwill associated with

22

the ConocoPhillips Brands . . . ." And Gulshan signed off on Section 5(J) of the BMA, which affirmatively stated,

> Marketer [Gulshan] specifically understands and agrees that *the Brand and Image Standards are reasonable and of material significance to this Agreement and to the consumers who patronize Marketer Supplied Outlets* [here, *the Handi-Stop*]. Marketer further understands and will ensure that its Marketer Supplied Dealers [here, Bin] understand and acknowledge that it is reasonable for ConocoPhillips to debrand any Marketer Supplied Outlet which does not comply with this Section 5, or to terminate this Agreement in its entirety where the violation involves multiple Marketer Supplied Outlets, upon written notice . . . .

Gulshan clearly did not establish as a matter of law that it had *not* undertaken to render services to ConocoPhillips which it should have recognized as necessary for the protection of the community served by the Handi-Stop and the Handi-Stop's customers when it agreed in the BMA not to permit or cooperate in any conduct that failed to "complement the community" or that reflected unfavorably on the reputation of ConocoPhillips or that impaired ConocoPhillips' goodwill in the community, including not permitting the sale of illegal drugs and drug paraphernalia at the Handi-Stop. Rather, the evidence establishes the opposite. And Gulshan expressly recognized in the BMA that the Brand and Image Standards it failed to maintain here were "of material significance" to its agreement with ConocoPhillips and the consumers who patronized the Handi-Stop.

Gulshan affirmatively acknowledged its undertaking not to permit the sale of illegal drugs like synthetic marijuana and drug paraphernalia on the premises of the

23

Handi-Stop, an undertaking that it knew or should have known was necessary to protect the community and the customers of the HandiStop from the grave physical danger those products posed—and that were actually inflicted on Emily Bauer—and thus to prevent harm to ConocoPhillips' reputation and goodwill. Gulshan likewise was apprised by the BMA that, if it failed to perform its undertaking not to permit such sales on the premises of the HandiStop, ConocoPhillips could take action, including severe action, such as debranding the service station and the Handi-Stop and, in the case of multiple violations, terminating its contract with Gulshan, thereby protecting both the community and its own reputation. Gulshan expressly assumed a duty, as ConocoPhillips' agent, to protect the customers of service stations and convenience stores branded with ConocoPhillips' name from the dangers resulting from the sale of illegal drugs and drug paraphernalia on its premises by executing the BMA. Had Gulshan not assumed this duty, ConocoPhillips itself or another of its agents would have had to undertake this duty to ensure protection of the community and customers of the Handi-Stop and, thereby, to protect its own reputation and good will. Accordingly, I would hold that the duty assumed and neglected by Gulshan met the requirements of subsection (b) of Restatement section 324A and of *Nall*, *Fox*, and *Seay*.

The BMA also established Gulshan's duty under subsection (c) of Restatement section 324A, because ConocoPhillips relied on Gulshan's contractual

24

undertaking to ensure that illegal drugs and drug paraphernalia would not be sold at the Handi-Stop, thus forbearing from taking action to do so itself. *See* RESTATEMENT (SECOND) OF TORTS § 324A cmt. e ("The actor is also subject to liability to a third person where the harm is suffered because of the reliance of the other for whom he undertakes to render the services, or of the third person himself, upon his undertaking. This is true whether or not the negligence of the actor has created any new risk or increased an existing one. Where the reliance of the other, or of the third person, has induced him to forgo other remedies or precautions against such a risk, the harm results from the negligence as fully as if the actor had created the risk.").

And finally, with regard to subsection 324A(a), Gulshan failed to meet its burden to show, as a matter of law, that its failure to ensure Handi-Stop #79's compliance with ConocoPhillips' mandatory Brand and Image Standards—including the Handi-Stop's compliance with the standard prohibiting the sale of illegal drugs or drug paraphernalia on its premises—did *not* result in increased risk of grave bodily harm to teenagers frequenting the store, like Emily Bauer. *See Seay*, 730 S.W.2d at 775–76 ("One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to [perform] his undertaking, if . . . his failure to exercise reasonable care increases the risk of [such]

25

harm . . . .") (quoting RESTATEMENT (SECOND) OF TORTS § 324A). Gulshan's failure to perform its undertaken duty plainly increased the risk of physical harm to Emily and other young customers of the Handi-Stop by permitting them access to dangerous illegal drugs unavailable at any other store in the community. And there is clearly a material fact issue as to whether the purchase and use of those drugs resulted from Gulshan's breach of its duty of reasonable care and directly caused Emily to have the massive strokes and a heart attack that caused her catastrophic harm.

As to proof of the remaining elements of her negligence cause of action, clearly Bauer's evidence—including evidence that "bags or brands of synthetic marijuana, such as Kush, Klimax, Cloud 9 and Dopey, were taped to the inside of the dividing window by the cash register so customers could see what was available for purchase"; that Handi-Stop #79 prominently labeled itself as a "smoke shop"; that other drug paraphernalia, including bongs, pipes, and grinders, was in plain sight by the cash register at all times; and that this was the case on December 7, 2012, when Emily and her friends visited the store and purchased one package of "Kush" synthetic marijuana and one package of "Klimax"—raised a material fact issue regarding whether Gulshan breached its duty of care by failing to take reasonably prudent measures to remedy these blatant violations of ConocoPhillips' Brand and Image Standards, and whether such breach proximately caused Emily's injuries.

26

I would hold as a matter of law that Gulshan assumed a duty of reasonable care under the BMA not to permit the sale of harmful and illegal drugs and drug paraphernalia on the premises of the ConocoPhillips service station and Handi-Stop #79. And I would hold that Bauer has raised a material fact issue as to whether Gulshan performed that duty negligently, proximately causing harm to Emily Bauer.

I would hold, therefore, that Gulshan has failed to disprove as a matter of law any of the elements of Bauer's negligent undertaking claim and that, conversely, Bauer has clearly raised material fact issues with respect to all elements of her claim.

I would sustain Bauer's sole issue.

## Conclusion

I would reverse the trial court's judgment and remand the case for trial on the merits of Bauer's negligent undertaking claim.

Evelyn V. Keyes
Justice

Panel consists of Chief Justice Radack and Justices Keyes and Countiss.

Justice Keyes, dissenting.

27